FILED

February 26 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

05-222

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 62

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

JARED LEE ROSLING,

        Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDC-2004-032
Honorable Jeffrey Sherlock, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        William F. Hooks, Attorney at Law, Helena, Montana

        For Appellee:

        Hon. Mike McGrath, Montana Attorney General, Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

        Leo Gallagher, Lewis & Clark County Attorney, Helena, Montana

Submitted on Briefs:  January 16, 2008

Decided:  February 26, 2008

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Jared Lee Rosling appeals from his conviction and sentence in the District Court for the First Judicial District, Lewis and Clark County, on charges of deliberate homicide, aggravated kidnapping, aggravated burglary, tampering with or fabricating physical evidence, and criminal possession of dangerous drugs (methamphetamine). We affirm.

¶2 We restate the issues on appeal as follows:

1. Did the District Court err in denying Rosling's motion to dismiss all of the charges for insufficient evidence?

2. Is the parole-eligibility restriction on Rosling's sentence illegal?

3. Is Rosling's sentence illegal because the prosecutor referred to a swastika tattoo on Rosling's back during the sentencing hearing?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On the morning of Sunday, February 1, 2004, at approximately 8:00 a.m., Richard Dooley arrived at the home of his 21-year-old daughter, Jessica Dooley, in Helena, Montana. He had plans to go snowmobiling with a friend that morning, and he went to Jessica's house to pick up his snowmobiles, which were kept on a trailer in the driveway. After securing the trailer to the back of his pickup, Richard went inside the house. Upon entering, he smelled smoke and immediately began searching for its source. He eventually found Jessica's naked body lying dead on the bathroom floor with her feet toward the door. A plastic bag had been wrapped around her head and fastened with a ligature. Magazines had been placed under her legs and set on fire. Richard used a fire

2

extinguisher to put out the fire and then went outside the house and called 911. The time at this point was approximately 8:20 a.m.

¶4 An examination of the crime scene suggested that Jessica had been attacked in her bedroom, where she defecated, and then ended up in the bathroom, where she was stabbed numerous times. Investigators found very little blood in the bedroom; however, they found fecal matter on the bed and on an article of clothing. It appeared that the clothing may have been used to wipe up some of the fecal matter. There also was fecal matter on the bedroom floor, which appeared to have "some directionality" to it. In the bathroom, investigators observed blood on the walls, on the countertop, in the sink, and in the area surrounding the bathtub. They also found two t-shirts on the countertop and a pair of blue shorts in the sink. One of the officers noted that fecal matter was "mixed in with the blood and the shorts" in the bathroom sink. It was later determined that Jessica typically slept in shorts and a t-shirt.

¶5 An autopsy revealed evidence of neck compression or strangulation, possibly to the point that Jessica lost consciousness. The medical examiner, Dr. Gary Dale, testified in this regard that it is "not uncommon" for people to defecate while being choked. However, Dale concluded that strangulation was not the cause of Jessica's death. Rather, the cause of death was multiple cutting and stab wounds. He observed about 67 stab wounds and 28 cutting or incised wounds on her body. With respect to some of the cuts on Jessica's hands, Dale concluded that "she could have been conscious at the time grabbing at the instrument," i.e., the cuts "potentially" were defensive wounds. But with the numerosity of the wounds, he could not rule out that her hands "may have just been in

3

proximity to" the instrument. With respect to the plastic bag placed over Jessica's head, he concluded that this was done postmortem.

¶6 The State ultimately charged Rosling with five felony offenses: Count I – deliberate homicide, in violation of § 45-5-102(1)(a), MCA, or, in the alternative, Count II – deliberate homicide, in violation of § 45-5-102(1)(b), MCA (commonly known as the felony-murder rule); Count III – aggravated kidnapping, in violation of § 45-5-303(1)(c), MCA; Count IV – aggravated burglary, in violation of § 45-6-204(2)(b), MCA; Count V – tampering with or fabricating physical evidence, in violation of § 45-7-207(1)(a), MCA; and Count VI – criminal possession of dangerous drugs (methamphetamine), in violation of § 45-9-102, MCA.[1] A jury trial was held October 4 through October 18, 2004, and the State's evidence revealed the following.

¶7 The evening prior to Jessica's death (January 31, 2004), Rosling, Jessica, and several friends were drinking at local bars in Helena and at a party in a private residence in East Helena. In addition to drinking alcoholic beverages, Rosling also used methamphetamine that night. Toxicology reports indicated that Jessica was intoxicated at the time of her death but that she had not ingested any drugs.

¶8 At the party in East Helena, several people, including Rosling and Jessica, played a game called "quarters," which involved flicking a quarter at an opposing player's knuckles, sometimes resulting in cuts and blood on the player's hands. Both Rosling and Jessica received cuts on their hands while playing this game.

---

[1] All statutory references herein are to the 2003 Code, which was in effect at the time the offenses at issue were committed.

¶9 The party broke up at around 4:00 or 5:00 a.m. the following morning (February 1). Some people stayed at the East Helena residence and watched a movie or fell asleep. Others headed back to Helena. Rosling and a friend, Ryan Hill, discussed going skiing later in the day. Rosling then drove Jessica and another friend, Mike Taylor, back to their vehicles at the Valley Hub bar on the north side of Helena. Jessica sat in the front seat; Taylor sat in the back seat. Rosling dropped Taylor off first, but Taylor did not observe where Rosling and Jessica went after that. Taylor arrived home between 5:30 and 6:00 a.m. and played a game of cribbage with his landlord before going to bed.

¶10 The State called one of Jessica's neighbors, who testified that at approximately 6:00 a.m. on February 1, she got up to let her dog out and happened to see a car being parked across the street from her house. The neighbor saw someone get out of the driver's side of the car, but since it was still dark at that hour, she could not make out whether it was a man or a woman and she could not see where the person went. In addition, she testified that while she could not make out any details of the car at that hour, she was able to do so by about 7:00. The neighbor later identified Rosling's car as the car she had seen parked across the street. The neighbor further testified that at approximately 8:00, she saw a man matching Rosling's general description returning "very quickly" to the car from the direction of Jessica's house and driving away. The neighbor observed that the man was carrying a paper sack in one hand.

¶11 One of the investigating officers testified that there were fresh shoeprints in the snow along the garage and in the back yard of Jessica's house. The direction of the shoeprints indicated that someone had walked behind the garage, climbed over a chain

5

link fence into the back yard, and proceeded to a back patio area. The officer did not find any return path, i.e., fresh tracks leading from the back to the front of the house. However, the officer found fresh shoeprints in the driveway area leading away from Jessica's house in the direction of where Rosling's car had been parked. Whereas the spacing of the shoeprints along the garage and in the back yard indicated that the person had "a normal walk" or "maybe a little shorter than a walk," the spacing of the shoeprints across the driveway indicated that the person was "in a hurry or running."

¶12    The State's evidence indicated that Rosling then went to Wal-Mart, arriving at about 8:20 a.m. Although he had been wearing jeans earlier that night (a security videotape obtained from Lucky Lil's showed him wearing jeans at about 1:30 a.m.), he entered Wal-Mart wearing long underwear. According to a computer-generated receipt the police obtained from Wal-Mart, Rosling purchased thermal socks, boxer shorts, and sweatpants at 8:35 a.m. Rosling then went to Target, where he purchased two compact discs. Rosling returned to Wal-Mart and purchased a birthday card at 10:27 a.m. He then went to Shopko and, at 11:15 a.m., purchased gloves, deodorant, and a soft drink.

¶13    Rosling eventually left Helena and went to Great Divide Ski Area, arriving at approximately noon. Hill and Taylor arrived about an hour later, and Hill skied several runs with Rosling. Hill testified that he brought up Jessica's murder several times, but Rosling did not have anything to say about it. Instead, Rosling talked about the new ski gear he had just purchased. Rosling did tell Hill that he had left Jessica at the Valley Hub bar along with Taylor and then slept in his car for a couple of hours. Rosling also said that his girlfriend, Janis Hazlitt, would not let him in her house that morning.

6

¶14 Hazlitt testified that Rosling left her house at 8:00 or 9:00 the evening of January 31 to return some movies they had rented and pick up some others. However, he did not return home as planned. Hazlitt called Rosling and learned that he had run into some friends. Hazlitt did not see Rosling again until he returned home from skiing at around 4:00 p.m. the following day. She testified that when she had last seen Rosling the previous evening, he was wearing a coat, jeans, and a long-sleeved shirt and when he returned the following day, he was wearing the same coat but new sweatpants and a different shirt. Upon arriving home, Rosling took a shower and laundered his clothes. At about 7:15 p.m., a detective with the Helena Police Department arrived at Hazlitt's house and arrested Rosling on an outstanding misdemeanor warrant. The detective also collected Rosling's clothes, shoes, and cell phone and had Rosling's car transported to the State Crime Lab for processing.

¶15 Rosling waived his *Miranda* rights and gave two statements to authorities, one the evening of February 1 and the other the morning of February 2. Portions of his statements were inconsistent with each other and with the timeline of events established by investigators for the morning of February 1. For example, Rosling gave several different times that he had been at Wal-Mart that morning, including 7:00, 7:30, and 9:00. Notably, the 7:00 and 7:30 times conflicted with Rosling's statement that after dropping Jessica and Taylor off at the Valley Hub bar, he returned to East Helena and slept in his car for 3 or 3½ hours outside the residence where the party had been held. Moreover, it seemed implausible that Rosling would have slept in his car for several hours, given the frigid temperatures that morning and the fact that he earlier had been offered a place to

7

sleep inside the East Helena residence. Rosling also stated that he arrived at Great Divide Ski Area between 10:30 and 11:00 a.m., but a receipt indicated that he made purchases at Shopko at 11:15 a.m. Rosling's account of his activities was also inconsistent with the phone records obtained by the police.

¶16 One of the investigating detectives testified that Rosling admitted to using methamphetamine. The detective further testified that he collected biological samples from Rosling, including hair and urine samples, and that the forensic report on the urine sample indicated that Rosling had methamphetamine in his system.

¶17 Deborah Hewitt, a forensic scientist at the State Crime Lab, testified that the size-12 shoeprints found in the snow outside Jessica's home were consistent in size, shape, and tread design with Rosling's shoes. However, Hewitt acknowledged that none of the fingerprints in Jessica's home were Rosling's and that a palm print at the scene could not be positively linked to Rosling.

¶18 Alice Ammen, another forensic scientist at the State Crime Lab, testified that a quarter-inch reddish facial hair had been found on the plastic bag over Jessica's head. Ammen compared this hair to facial hairs obtained from three subjects: Rosling, Richard Dooley, and John Fleming (a friend of Jessica who had been seeing her on a regular basis in January 2004). Ammen was able to exclude Richard and Fleming, but she was not able to exclude Rosling as the contributor of the hair. She conceded that she could not say when and how the hair got onto the bag.

¶19 Stacey Brown, a DNA analyst at the State Crime Lab, testified concerning a variety of evidence collected by investigators. She stated that the blue shorts found in the

8

bathroom sink smelled distinctly of urine and contained a lot of "flaky material." Based on her experience, she stated that the flaky material appeared to be fecal matter, though she acknowledged that she was not able to say conclusively, based on her analysis, that Jessica had worn these shorts on the night in question. Brown explained that fecal matter "is a rather harsh environment for DNA" and that DNA analysis, therefore, is not always possible. But she tested some of the fecal matter found at the scene and determined that it was of human origin. Brown also analyzed biological samples taken from Jessica's vaginal and anal area and did not find any indications of sexual assault.

¶20    Brown also testified concerning blood that was discovered in Rosling's car and on Rosling's clothing. According to Brown, although there were weak indications of blood on the interior of the vehicle, the results were largely inconclusive. Brown also found indications of blood on Rosling's shoes, but they were so weak that she did not perform species testing on them to determine if it was human blood. Brown also found indications of blood on different parts of Rosling's coat. Although some of the blood could not be identified through DNA or species testing, Brown determined that a spot of blood on the upper portion of Rosling's coat came from Jessica. In addition, Jessica could not be excluded as the contributor of two other blood stains on the coat. On cross-examination, Brown acknowledged that this blood could have come from nicks or cuts on Jessica's hands.

¶21 At the close of the State's case-in-chief, Rosling made a motion to dismiss all of the charges for insufficient evidence.[2] The District Court initially denied the motion with respect to all but the aggravated kidnapping charge. The court questioned the prosecutor as to what evidence supported aggravated kidnapping. In response, the prosecutor argued that there was evidence Jessica had been strangled in her bedroom to the point that she defecated, although this was not the cause of death, and then she was taken by force into the bathroom. The prosecutor further argued that removing Jessica from one place to the other was kidnapping and that her bathroom qualified as "a place of isolation" as contemplated by § 45-5-303(1), MCA. On the question of "restrain[t]" under § 45-5-303(1), MCA, the prosecutor offered three theories: (1) Jessica was restrained when she was strangled, (2) Jessica was restrained when she was taken by force to the bathroom, and (3) Jessica was restrained when the stab wounds were inflicted, since, according to the prosecutor, "[v]ery few of [the 67 stab wounds] would have been fatal. They were to

_____

[2] Although defense counsel correctly moved to dismiss, the District Court inquired whether she was "properly" asking for a directed verdict. Likewise, on appeal, Rosling and the State both refer to his motion made at the close of the State's case as one for a directed verdict. Although our caselaw contains many references to a "motion for a directed verdict," we recently noted that there is no statutory authority for using this terminology. *See State v. McWilliams*, 2008 MT 59, ¶ 36, ___ Mont. ___, ¶ 36, ___ P.3d ___, ¶ 36. Rather, § 46-16-403, MCA, refers to the motion, made "at the close of the prosecution's evidence or at the close of all the evidence," as one to "dismiss the action" because "the evidence is insufficient to support a finding or verdict of guilty." The correct designation, therefore, is a "motion to dismiss for insufficient evidence"—not a "motion for a directed verdict"—and we urge the bench and bar to refer to such motions accordingly. In addition, we note here that this is only a matter of terminology; the standard for granting or denying a motion to dismiss for insufficient evidence and our standard of review on appeal are no different than the standards applicable to what we heretofore have termed a "motion for a directed verdict." *See McWilliams*, ¶ 37; *State v. Swann*, 2007 MT 126, ¶¶ 16, 19, 337 Mont. 326, ¶¶ 16, 19, 160 P.3d 511, ¶¶ 16, 19. These standards are set forth in ¶¶ 33 and 35 below.

terrorize her." The court expressed some skepticism as to the State's theories but denied Rosling's motion on the aggravated kidnapping charge "for now."

¶22 Rosling testified in his defense. He stated that when he dropped Jessica off at her vehicle parked at the Valley Hub bar, she repeated an earlier invitation for him to come to her house and sit in the hot tub. Although he accepted the invitation, Rosling instead drove to Hazlitt's house to retrieve some clothes and gear for skiing later that day. Rosling testified that Hazlitt had called him several times throughout the night and was angry with him for staying out all night drinking with his friends. Thus, upon arriving at her house, rather than face Hazlitt, Rosling went directly to the detached garage to get his ski clothing, though all he could find was long underwear. He decided that he would buy a new pair of goggles and gloves.

¶23 Rosling then left Hazlitt's house and returned to East Helena, apparently with the intention of sleeping at the house where the party had been held. After searching for about 20 minutes, he located the house; but once there, he did not go in. Rosling testified that at this particular time, he was feeling "really indecisive" and was still considering going to Jessica's to sit in the hot tub. So, he sat outside in his car for about 5 to 10 minutes and then decided to take Jessica up on her invitation.

¶24 When he got to Jessica's house, which he testified he had some difficulty finding, Rosling knocked on the front door. There was no answer, so he knocked briefly on a second door next to the garage. Again, there was no answer, and he thought maybe she had gone to sleep. So, he decided to go knock on her window. He walked around the garage and hopped over the back fence. Once in the back yard, he saw the hot tub and

11

noticed that the sliding glass door between the house and the hot tub area was open slightly. Rosling thought this meant that Jessica was getting prepared for the hot tub and was expecting him.

¶25 According to Rosling, he entered the house through the sliding glass door and called out to Jessica a couple of times. He proceeded through the house and eventually noticed feet on the bathroom floor. He pushed the bathroom door open and discovered the body of a woman lying on the floor, which he assumed was Jessica. Rosling testified that there was blood all over the bathroom, but he did not see any fire. Rosling immediately left the house, ran back to his car, and drove away. According to Rosling, these events occurred at around 7:30 a.m.

¶26 Rosling explained at trial that he did not call 911 to report what he had seen because he had been drinking and doing drugs and because it seemed to him that Jessica did not need help (since she appeared to be dead). Rosling testified that after he left Jessica's house, he felt "shock, disbelief" and just wanted "to leave" and "get up to that ski hill fast." He drove to a number of stores, including Wal-Mart, Bob Wards sporting goods, Target, Shopko, and Capital Sports and Western, to gather supplies for skiing.

¶27 Rosling admitted during cross-examination that he was untruthful with detectives "a number of times" during their investigation. For example, Rosling admitted he was untruthful when he told one of the detectives that he was not interested in Jessica. Rosling also admitted he was untruthful when he told the detective that he had slept in his car outside the house in East Helena. Rosling admitted he was untruthful when he told his friend Beau Breneman the same thing (i.e., that he had slept in his car outside the East

Helena residence). In addition, Rosling admitted he was untruthful when he told Hazlitt at around 1:30 that morning that he would be right home, and Rosling admitted he was untruthful when he told Hill that Hazlitt would not let him into her house after the party.

¶28 The prosecutor also questioned Rosling about his jeans, noting that sometime between leaving Jessica's house and walking into Wal-Mart, he changed out of the jeans and into long underwear. Rosling stated that he had done so in his car—notwithstanding the facts that he had to "manipulate [his] way around the steering column" in the process and that he was aware Wal-Mart had dressing rooms. However, Rosling maintained that there was not any blood on his jeans and that the jeans seized by the detective were the same jeans he had been wearing that night.

¶29 At the conclusion of all the evidence, Rosling requested a ruling on the record concerning his motion to dismiss for insufficient evidence made at the close of the State's case, particularly with respect to the aggravated kidnapping charge. The court stated that the motion was denied.

¶30 The jury found Rosling guilty on Count I and Counts III through VI. The District Court entered judgment on January 19, 2005, sentencing Rosling on Count I to life in prison without the possibility of parole, on Count III to life in prison, on Count IV to 40 years in prison, on Count V to 10 years in prison, and on Count VI to 5 years in prison. The court ordered that these sentences were to run concurrently. Rosling now appeals.

¶31 Additional facts are set forth below as they relate to the specific issues on appeal.

**DISCUSSION**

¶32     *Issue 1. Did the District Court err in denying Rosling's motion to dismiss all of the charges for insufficient evidence?*

**Standard of Review**

¶33     Rosling and the State dispute the appropriate standard of review of a district court's denial of a motion to dismiss for insufficient evidence under § 46-16-403, MCA. Rosling argues that the standard is de novo, while the State maintains that the standard is abuse of discretion. This dispute, however, is now moot in light of *State v. Swann*, 2007 MT 126, 337 Mont. 326, 160 P.3d 511, which was decided after the briefing in this case was completed. In *Swann*, we clarified that the proper standard of review of a denial of a motion to dismiss for insufficient evidence (heretofore, a "motion for a directed verdict," *see* ¶ 21 n. 2, *supra*) is de novo, and we overruled our prior cases to the extent that they stand for a different standard of review. *See Swann*, ¶¶ 16-19; *see also State v. McWilliams*, 2008 MT 59, ¶ 37, ___ Mont. ___, ¶ 37, ___ P.3d ___, ¶ 37.

**Counts I, IV, and V**

¶34     As noted above, the State charged Rosling with Count I – deliberate homicide, in violation of § 45-5-102(1)(a), MCA; Count IV – aggravated burglary, in violation of § 45-6-204(2)(b), MCA; and Count V – tampering with or fabricating physical evidence, in violation of § 45-7-207(1)(a), MCA. Rosling asserts that the District Court erred in denying his motion to dismiss each of these charges for insufficient evidence. He further

asserts that the evidence at the conclusion of trial was insufficient to prove the elements of these charges.[3]

¶35  A motion to dismiss for insufficient evidence is appropriate only if, viewing the evidence in the light most favorable to the prosecution, there is not sufficient evidence upon which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Section 46-16-403, MCA; *Swann*, ¶¶ 16, 19.  Rosling argues that there was no direct evidence that he committed any of the foregoing offenses, and he contends that the circumstantial evidence presented by the State was not legally sufficient to justify a jury in determining guilt beyond a reasonable doubt.

¶36  "Circumstantial evidence" is that which tends to establish a fact by proving another and which, though true, does not of itself conclusively establish that fact but affords an inference or presumption of its existence.  Section 26-1-102(1), MCA.  When circumstantial evidence is susceptible to two reasonable interpretations, one which supports guilt and the other which supports innocence, the trier of fact determines which interpretation is most reasonable.  *State v. Hall*, 1999 MT 297, ¶ 22, 297 Mont. 111, ¶ 22, 991 P.2d 929, ¶ 22.  Circumstantial evidence alone may be sufficient to obtain a conviction.  *State v. Southern*, 1999 MT 94, ¶ 92, 294 Mont. 225, ¶ 92, 980 P.2d 3, ¶ 92; *State v. Vukasin*, 2003 MT 230, ¶ 20, 317 Mont. 204, ¶ 20, 75 P.3d 1284, ¶ 20.  Circumstantial evidence must only be of such a quality and quantity as to legally justify a

---

[3] Rosling briefs Counts I, IV, and V together.  He provides a separate and more involved analysis of Count III (the aggravated kidnapping charge), which we address separately below.  We also address Count VI (the criminal possession of dangerous drugs charge) separately below.

jury in determining guilt beyond a reasonable doubt, and all facts and circumstances must be considered collectively. *Southern*, ¶ 92.

¶37 A person commits the offense of deliberate homicide if the person "purposely or knowingly causes the death of another human being." Section 45-5-102(1)(a), MCA. A person acts purposely with respect to a result if it is the person's conscious object to cause that result. Section 45-2-101(64), MCA. A person acts knowingly with respect to a result when the person is aware that it is highly probable that the result will be caused by the person's conduct. Section 45-2-101(34), MCA.

¶38 A person commits the offense of aggravated burglary if the person "knowingly enters or remains unlawfully in an occupied structure with the purpose to commit an offense therein and . . . in effecting entry or in the course of committing the offense or in immediate flight thereafter, [the person] purposely, knowingly, or negligently inflicts or attempts to inflict bodily injury upon anyone." Section 45-6-204(2)(b), MCA (paragraph breaks omitted). A person enters or remains unlawfully in an occupied structure when the person "is not licensed, invited, or otherwise privileged to do so." Section 45-6-201(1), MCA. "Bodily injury" means physical pain, illness, or an impairment of physical condition and includes mental illness or impairment. Section 45-2-101(5), MCA.

¶39 A person commits the offense of tampering with or fabricating physical evidence "if, believing that an official proceeding or investigation is pending or about to be instituted, [the person] . . . alters, destroys, conceals, or removes any record, document, or thing with purpose to impair its verity or availability in such proceeding or investigation." Section 45-7-207(1)(a), MCA (paragraph break omitted).

16

¶40 Rosling asserts that "[t]he mere fact that [he] was placed near [Jessica's] house" on the morning of February 1, 2004, "does not mean that [he] entered the house and stabbed Jessica to death," "does not establish beyond a reasonable doubt that he entered the house with the intent to commit a felony," and "does not establish beyond a reasonable doubt that he tried to burn evidence and thereby escape detection." Rosling argues that in light of the nature and number of stab wounds, "a rational jury would expect that the assailant would have a great deal of blood or other genetic material on his or her person, clothing or shoes"; yet, "[t]he state's experts did not find Jessica's blood on Rosling's shoes or pants." Rosling acknowledges that Jessica's blood was found on his coat, but he points out that Jessica had blood on her hand from playing quarters at the East Helena party and that her blood "could have transferred from Jessica's hand to [Rosling's] coat" due to their "proximity" when he drove her back to the Valley Hub bar. Finally, Rosling asserts that the hair found at the crime scene "was insufficient to permit the jury to convict [him]."

¶41 In response, the State points out that "a highly observant" neighbor saw Rosling arrive in the vicinity of Jessica's house at around 6:00 a.m. and leave at around 8:00 a.m. and that this neighbor, who was "vigilantly alert," did not see other cars come and go. In addition, the State observes that Rosling's shoeprints were found in Jessica's yard and that the facial hair found on the plastic bag wrapped around Jessica's head could be excluded as belonging to other possible suspects but could not be excluded as Rosling's. Furthermore, the State notes that of all the clothing analyzed at the crime lab, Jessica's blood was only on Rosling's clothing; and with respect to Rosling's contention as to the

17

amount of blood one might expect to find on the assailant's person, clothing, or shoes, the State points out that Rosling laundered his clothes later that day. Finally, the State argues that while every other potential suspect could give a corroborated account of his or her time between leaving the East Helena party and Jessica's body being discovered, Rosling could not.

¶42 Considering all of the facts and circumstances collectively, and viewing the evidence in the light most favorable to the prosecution, we do not agree with Rosling that at the close of the State's case, there was insufficient evidence upon which a rational trier of fact could find the essential elements of Counts I, IV, and V beyond a reasonable doubt. According to the State's evidence, Rosling was with Jessica the night of her death. They were both drinking, and Rosling ingested methamphetamine. Rosling gave Jessica a ride to her car when the party in East Helena broke up, and Rosling apparently was the last person to see Jessica alive. Jessica was murdered in her house, and Rosling's car was seen parked near the house early that Sunday morning around the time of the murder. Jessica died from the multiple cutting and stab wounds, of which there were about 28 cutting wounds and 67 stab wounds. Magazines had been placed under her legs and set on fire. Shoeprints matching the size, shape, and tread design of Rosling's shoes were discovered leading to the patio area behind Jessica's house at a normal walking pace and leaving across the driveway at a hurried pace. One of Jessica's neighbors testified that a man matching Rosling's general description hurriedly left Jessica's house and drove away in Rosling's car at approximately 8:00 a.m. Jessica's father arrived at the house at about this same time and, shortly thereafter, discovered Jessica's body and the

burning magazines. There were indications of blood on Rosling's shoes. A spot of Jessica's blood was discovered on Rosling's coat, and she could not be excluded as the contributor of two other blood stains on the coat. Rosling wore jeans during the course of the night but walked into Wal-Mart at 8:20 a.m. wearing long underwear. He had cuts on his hands. He was unable to account accurately for his whereabouts that morning, and he gave the police inconsistent statements concerning his actions during the evening before and the morning of the murder.

¶43 The State's evidence against Rosling was circumstantial, no one having actually seen him commit the offenses of deliberate homicide, aggravated burglary, and tampering with or fabricating physical evidence. And we agree with Rosling that presence at a crime scene is insufficient, by itself, to prove criminal liability. *See Southern*, ¶ 94; *State v. Johnston*, 267 Mont. 474, 481, 885 P.2d 402, 406 (1994). However, the State's evidence did not merely place Rosling at the scene of Jessica's murder; it connected him to that crime. Although the State's evidence was susceptible to two reasonable interpretations—one pointing to Rosling's guilt and the other pointing to an alternative explanation of how he came to have Jessica's blood on his coat, why he was seen hurriedly leaving her house around the time of the murder, and why he changed out of his jeans and into long underwear before walking into Wal-Mart—this does not mean that the evidence was insufficient to support a verdict of guilty. It was the province of the jury to decide which interpretation of the evidence was most reasonable. *See Hall*, ¶ 22. Accordingly, after a review of the record, we hold that the State's circumstantial evidence was of sufficient quality and quantity that a rational trier of fact could find Rosling guilty

beyond a reasonable doubt of Counts I, IV, and V. *Cf. Southern*, ¶¶ 91-94. The District Court did not err in denying Rosling's motion to dismiss for insufficient evidence as to these three charges.

¶44    As for Rosling's contention that the evidence at the conclusion of trial was insufficient to prove the elements of Counts I, IV, and V, we note that in addition to the foregoing evidence produced by the State, Rosling admitted during his testimony that he had been untruthful with the investigators, his girlfriend, and some of his friends regarding the events of January 31 and February 1. He admitted that he was at Jessica's house the morning of her death not long before her body was discovered by her father. His account was fraught with inconsistencies and was contradicted by a number of the State's witnesses. Although Rosling insisted that Jessica was already dead when he entered her house and found her on the bathroom floor, it was up to the jury to decide which version of events—the State's or Rosling's—to believe. *See State v. McGarvey*, 2005 MT 308, ¶¶ 19-20, 329 Mont. 439, ¶¶ 19-20, 124 P.3d 1131, ¶¶ 19-20. We hold that the evidence at the conclusion of trial was sufficient for a rational trier of fact to find the elements of Counts I, IV, and V beyond a reasonable doubt.

**Count III**

¶45    Rosling was charged under Count III with aggravated kidnapping, in violation of § 45-5-303(1)(c), MCA. A person commits this offense if the person "knowingly or purposely and without lawful authority restrains another person by either secreting or holding the other person in a place of isolation or by using or threatening to use physical force, with any of the following purposes: . . . to inflict bodily injury on or to terrorize the

20

victim or another . . . ."  Section 45-5-303(1)(c), MCA (paragraph breaks omitted). Although the State must prove restraint, a specific period of restraint is not an element of this offense; in other words, the statute does not require specific proof regarding duration of restraint.  *State v. Smith*, 228 Mont. 258, 263-64, 742 P.2d 451, 454 (1987).

¶46    In the context of this case, therefore, the State had to produce sufficient evidence upon which a rational trier of fact could find beyond a reasonable doubt that Rosling knowingly or purposely and without lawful authority restrained Jessica by either secreting or holding her in a place of isolation or by using or threatening to use physical force, with the purpose of inflicting bodily injury on or terrorizing her.  We conclude that the State did so.

¶47    Based on the evidence produced by the State, a reasonable jury could have found that Rosling was high on methamphetamine and alcohol during the early morning hours of February 1, 2004; that he accosted and terrorized Jessica in her home over a protracted period of time; that he brutalized her by strangling her to the point that she defecated in her bedroom; that he dragged her or forced her into the bathroom; that he then stabbed her 67 times and cut her 28 times, thereby causing her death; and that during some or most of this period, Jessica was alive, in mortal fear, and fighting desperately for her life.

¶48    Rosling contends, however, that the State did not prove that he "restrained" Jessica by either secreting or holding her in a place of isolation or by using or threatening to use physical force.  First, Rosling argues that the bathroom was not "a place of isolation" as contemplated by § 45-5-303(1), MCA.  The statute, however, is written in the disjunctive:  "A person commits the offense of aggravated kidnapping if the person

21

knowingly or purposely and without lawful authority restrains another person by either secreting or holding the other person in a place of isolation *or* by using or threatening to use physical force, with any of the following purposes . . . ." Section 45-5-303(1), MCA (emphasis added). Thus, the State was not necessarily required to prove that Rosling restrained Jessica "by either secreting or holding [her] in a place of isolation." The State could prove instead that Rosling restrained Jessica "by using or threatening to use physical force."

¶49 Second, Rosling argues that the State "failed to prove that [Jessica] was restrained in the bedroom, and then removed." Rosling points out that "Dr. Dale testified merely that sometimes a person who is choked may soil himself or herself. It is not automatic." Rosling contends that "[a] reasonable jury could find, based on the state's evidence, only that some person defecated in a bedroom, and made some attempt to clean up or wipe it up with a coat." Rosling further contends that

> [t]he state's evidence indicates that [Jessica] soiled herself, tried to clean up, and was in the bathroom. The only alternative is that someone else-presumably the attacker- made some attempt to clean up the bedroom and rinse out shorts after Jessica was killed, but made no attempt to clean up the blood. This would be an irrational finding, to say the least.

¶50 We do not agree that the State's evidence is only subject to this particular interpretation. To the contrary, the evidence is also reasonably subject to a finding that Jessica was accosted and terrorized in her bedroom and was strangled to the point that she defecated there, after which she was dragged or forced into the bathroom, where she was stabbed 67 times and cut 28 times, thereby causing her death. Just because there may have been an attempt to clean up the fecal matter in the bedroom, but not the blood

22

in the bathroom, does not lead inevitably to the conclusion that Jessica was not restrained in the bedroom. Another reasonable interpretation of the evidence is that the assailant did not have the time or the ability to finish cleaning up the crime scene and disposing of the incriminating evidence. Yet another interpretation is that the assailant, after cleaning up some of the fecal matter, decided instead to burn all of the evidence (only to be thwarted by the arrival of Richard Dooley at a time when the fire could still be contained). As explained above, when circumstantial evidence is susceptible to more than one reasonable interpretation, the trier of fact determines which interpretation is most reasonable. *See Hall*, ¶ 22.

¶51 Lastly, Rosling argues that the act of homicide itself does not also constitute restraint for purposes of kidnapping. In other words, the act of killing Jessica by stabbing and cutting her repeatedly "does not provide the requisite restraint," since any such restraint would have been "incidental" to the act of killing her. In this regard, Rosling cites a number of cases from other jurisdictions for the proposition that kidnapping statutes do not apply to unlawful confinements or movements that are "incidental" to the commission of another felony. *See e.g. State v. Stouffer*, 721 A.2d 207, 212 (Md. 1998); *State v. Goodhue*, 833 A.2d 861, 864-65 (Vt. 2003); *Hoyt v. Commonwealth*, 605 S.E.2d 755, 757 (Va.App. 2004); *State v. Fuller*, 172 S.W.3d 533, 536-38 (Tenn. 2005); *see generally* Frank J. Wozniak, *Seizure or Detention for Purpose of Committing Rape, Robbery, or Other Offense as Constituting Separate Crime of Kidnapping*, 39 A.L.R.5th 283 (1996). Rosling suggests that if the State's "broad interpretation" of § 45-5-303(1),

MCA, were adopted, "every intentional killing would also constitute aggravated kidnapping."

¶52    It appears from Rosling's argument that he views the factual bases for the aggravated kidnapping and deliberate homicide charges in this case as identical or inseparable—i.e., the act of restraining Jessica in the bathroom in order to inflict 67 stab wounds and 28 cutting wounds is "incidental" to committing deliberate homicide and, thus, cannot also sustain a charge of aggravated kidnapping.  However, as explained above, the State's evidence supported a finding that Jessica was restrained in her bedroom by use of physical force—in particular, neck compression or strangulation—for the purpose of inflicting bodily injury on or terrorizing her.  Dr. Dale testified that the strangulation was *not* the cause of her death.  Rather, the cause of her death was the multiple cutting and stab wounds, which the evidence suggests were all inflicted in the bathroom.  The factual bases for the two charges, therefore, were entirely distinct; and Rosling's concern—namely, that simultaneous application of the deliberate homicide and aggravated kidnapping statutes to the facts of this case would result in every intentional killing also being an aggravated kidnapping—is misplaced.

¶53    Again, for purposes of Count III, a motion to dismiss for insufficient evidence should have been granted only if, viewing the evidence in the light most favorable to the prosecution, there was not sufficient evidence upon which a rational trier of fact could find that Rosling knowingly or purposely and without lawful authority restrained Jessica by using physical force, with the purpose of inflicting bodily injury on or terrorizing her.  Sections 45-5-303(1)(c), 46-16-403, MCA; *Swann*, ¶¶ 16, 19.  After a review of the

24

record, we hold that the State's circumstantial evidence was of sufficient quality and quantity that a rational trier of fact could find Rosling guilty beyond a reasonable doubt of Count III. The District Court did not err in denying Rosling's motion to dismiss for insufficient evidence as to this charge.

¶54 We reach the same conclusion with respect to Rosling's contention that the evidence at the conclusion of trial was insufficient to prove the elements of aggravated kidnapping. Although the defense attempted to refute the State's theory of the case with testimony supporting an alternative version of events, it was up to the jury to decide whose version of events to believe. *See McGarvey*, ¶¶ 19-20. We hold that the evidence at the conclusion of trial was sufficient for a rational trier of fact to find the elements of Count III beyond a reasonable doubt.

**Count VI**

¶55 Rosling was charged under Count VI with criminal possession of dangerous drugs (methamphetamine), in violation of § 45-9-102, MCA. "A person commits the offense of criminal possession of dangerous drugs if the person possesses any dangerous drug, as defined in 50-32-101." Section 45-9-102(1), MCA. Methamphetamine is a dangerous drug. *See* §§ 50-32-101(6), 50-32-224(3)(c), MCA. "Possession" is the knowing control of anything for a sufficient time to be able to terminate control. Section 45-2-101(58), MCA. In order to prove that the possession of a dangerous drug was with knowledge, it is necessary for the State to present evidence that the person was aware he or she controlled the dangerous drug or was aware of a high probability that he or she controlled the dangerous drug. Section 45-2-101(34), MCA; *In re R.L.H.*, 2005 MT 177, ¶ 24, 327

Mont. 520, ¶ 24, 116 P.3d 791, ¶ 24. The presence of a dangerous drug in one's body constitutes circumstantial evidence of prior possession of that substance. *R.L.H.*, ¶ 23. To establish criminal possession of a dangerous drug, the State must present evidence that such possession was voluntary. *R.L.H.*, ¶ 24 (citing § 45-2-202, MCA).

¶56 One of the investigating detectives testified during the State's case-in-chief that Rosling admitted having used methamphetamine. The detective further testified that the forensic report on the urine sample collected from Rosling indicated that Rosling had methamphetamine in his system. In addition, the State called Newly Potter, who was with Rosling at various times during the evening of January 31 and the morning of February 1. Potter testified that he knew Rosling used methamphetamine that night. Furthermore, Rosling admitted during his testimony that he purchased methamphetamine the weekend before Jessica's murder, that he kept the methamphetamine in the glove compartment of his car, and that he ingested some of the drug on the evening of January 31.

¶57 Given this evidence, we conclude that the State presented sufficient evidence upon which a rational trier of fact could find the essential elements of Count VI beyond a reasonable doubt. We thus hold that the District Court did not err in denying Rosling's motion to dismiss for insufficient evidence as to this charge. We further hold that the evidence at the conclusion of trial was sufficient for a rational trier of fact to find the elements of Count VI beyond a reasonable doubt.

¶58 *Issue 2. Is the parole-eligibility restriction on Rosling's sentence illegal?*

**Standard of Review**

¶59 We review criminal sentences that include at least one year of actual incarceration for legality only. *State v. Ariegwe*, 2007 MT 204, ¶ 174, 338 Mont. 442, ¶ 174, 167 P.3d 815, ¶ 174. Our review is confined to determining whether the sentencing court had statutory authority to impose the sentence, whether the sentence falls within the parameters set by the applicable sentencing statutes, and whether the court adhered to the affirmative mandates of the applicable sentencing statutes. *See Ariegwe*, ¶ 174. This determination is a question of law; as such, our review is de novo. *Ariegwe*, ¶ 175.

### Rosling's Jury Trial Claims

¶60 Again, Rosling was convicted under Count I of deliberate homicide, in violation of § 45-5-102(1)(a), MCA. The punishment for this offense is set forth in § 45-5-102(2), MCA, as follows:

> A person convicted of the offense of deliberate homicide shall be punished by death as provided in 46-18-301 through 46-18-310, unless the person is less than 18 years of age at the time of the commission of the offense, by life imprisonment, or by imprisonment in the state prison for a term of not less than 10 years or more than 100 years, except as provided in 46-18-219 and 46-18-222.

In addition, § 46-18-202(2), MCA, provides as follows:

> Whenever the sentencing judge imposes a sentence of imprisonment in a state prison for a term exceeding 1 year, the sentencing judge may also impose the restriction that the offender is ineligible for parole and participation in the supervised release program while serving that term. If the restriction is to be imposed, the sentencing judge shall state the reasons for it in writing. If the sentencing judge finds that the restriction is necessary for the protection of society, the judge shall impose the restriction as part of the sentence and the judgment must contain a statement of the reasons for the restriction.

¶61 Pursuant to these two statutes, the District Court sentenced Rosling on Count I to life imprisonment without the possibility of parole. In its written judgment, the court provided the following reasons:

> The Court finds that the defendant should be ineligible for parole, in that this was one of the most brutal and horrific crimes ever seen by this Court. Because of the nature of the offenses, the Court does not believe that the defendant can ever be rehabilitated, and he poses a serious risk to society.

¶62 On appeal, Rosling contends that imposition of the parole-eligibility restriction violated his rights to due process and a jury trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article II, Sections 17, 24, and 26 of the Montana Constitution. In addition, he contends that imposition of the restriction contravened § 46-1-401, MCA, which codifies the mandates of the Sixth and Fourteenth Amendments as construed by the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and its progeny.

¶63 In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63. In *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), the Supreme Court clarified that the "statutory maximum" for *Apprendi* purposes is "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S. Ct. at 2537 (emphasis omitted). In other words, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional

28

facts, but the maximum he may impose *without* any additional findings." *Blakely*, 542 U.S. at 303-04, 124 S. Ct. at 2537. Relying on *Apprendi* and *Blakely*, Rosling argues that the parole-eligibility restriction on his sentence is illegal and beyond the District Court's authority because it is based on facts not found by a jury beyond a reasonable doubt.

¶64 We considered this same issue in *State v. Garrymore,* 2006 MT 245, 334 Mont. 1, 145 P.3d 946, which was decided after the briefing in this case was completed. Following an analysis of §§ 45-5-102(2) and 46-18-202(2), MCA, we concluded that "the statutory maximum punishment for the crime of deliberate homicide when the death penalty is not sought, for the purposes of *Apprendi*, is life imprisonment without the possibility of parole." *Garrymore*, ¶ 32. In other words, life imprisonment without the possibility of parole is within the range of punishments authorized by a jury's guilty verdict on a deliberate homicide charge under § 45-5-102(1), MCA. Furthermore, we concluded that this logic applied to both Garrymore's federal constitutional claim and his claim under § 46-1-401, MCA. *See Garrymore*, ¶¶ 34, 37.

¶65 Likewise, in the case at hand, since the State did not seek the death penalty, the maximum punishment authorized by the jury's verdict of guilty on Count I was life imprisonment without the possibility of parole. For this reason, and based on the analysis set forth in ¶¶ 24-37 of *Garrymore*, we hold that imposition of the parole-eligibility restriction on Rosling's sentence did not violate his rights under the Sixth and Fourteenth Amendments and did not contravene § 46-1-401, MCA.

¶66 As for Rosling's claim based on Article II, Sections 17, 24, and 26 of the Montana Constitution, his supporting argument consists of one paragraph in which he points out,

correctly, that "this Court has applied these state guarantees in a manner which affords more protection that [sic] does the Sixth Amendment." As an example, he cites *Woirhaye v. District Court*, 1998 MT 320, 292 Mont. 185, 972 P.2d 800, in which we construed Article II, Sections 24 and 26, as affording a greater jury trial right than does the Sixth Amendment. However, Rosling does not explain what greater protection—i.e., what protection over and above the protection afforded by the Sixth and Fourteenth Amendments as interpreted in *Apprendi* and its progeny—is afforded by Article II, Sections 17, 24, and 26, within the context of this case. *Woirhaye*, which applied the jury trial right in an entirely different context, does not provide an answer. Thus, as we did in *Garrymore*, we conclude here that Rosling's argument is too undeveloped to undertake a distinctive application of state constitutional principles, and we will not consider the argument further. *See Garrymore*, ¶¶ 38-39.

¶67 We hold that the parole-eligibility restriction on Rosling's life sentence is not illegal based on his jury trial claims.

**Rosling's Evidentiary Claim**

¶68 In sentencing Rosling to life imprisonment without the possibility of parole, the District Court explained in open court that

> this is a brutal and horrific offense. I think everybody here agrees with that. And I also feel this is necessary to protect society, because there has been no evidence presented to me, and I know of none, that there is any treatment program known to man that would cure whatever it is that caused this horrific crime.

Likewise, as noted above, the court stated in its written judgment:

30

The Court finds that the defendant should be ineligible for parole, in that this was one of the most brutal and horrific crimes ever seen by this Court. Because of the nature of the offenses, the Court does not believe that the defendant can ever be rehabilitated, and he poses a serious risk to society.

¶69 Based on the foregoing, Rosling argues that the lack of prospects for his rehabilitation was "the primary basis" for imposing the parole-eligibility restriction on his sentence. But, he contends, the evidence before the District Court did not support the court's determination that he cannot be rehabilitated. Thus, Rosling asserts that there is no basis for the parole-eligibility restriction on his sentence. We disagree.

¶70 Sentencing judges have broad discretion to impose parole-eligibility restrictions on sentences that exceed a one-year term of imprisonment. *See Garrymore*, ¶ 27. However, if a parole-eligibility restriction is imposed, the sentencing judge is required to state the reasons for it in writing. *See* § 46-18-202(2), MCA ("If the restriction is to be imposed, the sentencing judge *shall* state the reasons for it in writing." (emphasis added)). Furthermore, a convicted criminal defendant has a due process right to be sentenced based on correct information. *State v. Harper*, 2006 MT 259, ¶ 18, 334 Mont. 138, ¶ 18, 144 P.3d 826, ¶ 18; *State v. Mason*, 2003 MT 371, ¶ 21, 319 Mont. 117, ¶ 21, 82 P.3d 903, ¶ 21. Thus, a parole-eligibility restriction that is not accompanied by written reasons or that is based on materially false information is illegal.

¶71 Here, however, Rosling provides nothing more than a conclusory assertion that the District Court's cannot-be-rehabilitated determination is incorrect or not supported by the evidence. There was testimony at the sentencing hearing, from the probation officer who prepared the presentence investigation report and from the mitigation specialist, to the

effect that the counseling and treatment Rosling received for emotional and chemical-dependency issues at various points in his childhood and adolescent years were ineffective. Furthermore, at the outset of pronouncing sentence, the judge noted that while Rosling maintained his innocence, the jury had found him guilty of "one of the most brutal and horrific offenses I have seen," and we agree that the nature and surrounding circumstances of the offense inform the question of the defendant's prospects for rehabilitation.

¶72    Moreover, even if the "primary" basis for imposing the parole-eligibility restriction was, as Rosling claims, the lack of prospects for rehabilitation, it was not the only basis. It is appropriate for a sentencing court to consider any evidence relevant to a defendant's sentence, including evidence relating to the crime, the defendant's character, background history, mental and physical condition, and any other evidence the court considers to have probative force. *State v. Shreves*, 2002 MT 333, ¶ 13, 313 Mont. 252, ¶ 13, 60 P.3d 991, ¶ 13. Here, the sentencing judge heard all of the evidence presented at trial concerning Rosling's actions. Further information about Rosling's character, social history, mental health history, family history, and employment history was presented at the sentencing hearing through the reports and testimony of the probation officer and the mitigation specialist, as well as the testimony of Hazlitt (Rosling's girlfriend) and Rosling's mother. It was only after consideration of all of this information that the judge imposed the parole-eligibility restriction. Again, the judge stated that this was one of the most brutal and horrific crimes he had ever seen. In this regard, Rosling acknowledges that the heinous nature of the crime is sufficient reason for imposing a parole-eligibility

restriction. *See State v. Christianson*, 1999 MT 156, ¶¶ 36-39, 295 Mont. 100, ¶¶ 36-39, 983 P.2d 909, ¶¶ 36-39.

¶73 This Court has never set forth a litmus test that must be met before a parole-eligibility restriction may be imposed; rather, we have left that decision to the sentencing court's discretion based on all of the relevant facts. *See Christianson*, ¶ 38. We hold that the written reasons provided by the District Court were sufficient, on the record before us, to impose the parole-eligibility restriction and that the restriction, therefore, is not illegal based on Rosling's evidentiary claim.

¶74 ***Issue 3. Is Rosling's sentence illegal because the prosecutor referred to a swastika tattoo on Rosling's back during the sentencing hearing?***

¶75 Rosling claims that the State violated his rights to freedom of speech and freedom of association under the First Amendment to the United States Constitution and Article II, Sections 4 and 7 of the Montana Constitution when the prosecutor made the following argument during the sentencing hearing: "Keep in mind that this defendant at some point made a deliberate choice to put a swastika on his back with the SS lightening [sic] strikes on it. What does that tell you about the nature of the individual before us?"

¶76 Rosling, however, did not object to these remarks. It is well-established that on direct appeal, the appellant is limited to those issues that were properly preserved in the district court and to allegations that his or her sentence is illegal. *State v. McLeod*, 2002 MT 348, ¶ 12, 313 Mont. 358, ¶ 12, 61 P.3d 126, ¶ 12; *State v. Southwick*, 2007 MT 257, ¶¶ 21-23, 339 Mont. 281, ¶¶ 21-23, 169 P.3d 698, ¶¶ 21-23. Thus, because Rosling failed to preserve this issue by timely objecting to the prosecutor's remarks, and because he has

not raised a plausible allegation that his sentence is illegal due to the remarks, the issue is not properly before us.

¶77 Apparently recognizing this fact, Rosling asserts that we should address the issue under our common-law doctrine of plain error review. This Court may discretionarily review a claimed error that implicates a criminal defendant's fundamental constitutional rights—even if a timely objection was not made in the trial court, and notwithstanding the inapplicability of the criteria set forth in § 46-20-701(2), MCA—where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *State v. Finley*, 276 Mont. 126, 137, 915 P.2d 208, 215 (1996), *overruled in part on other grounds*, *State v. Gallagher*, 2001 MT 39, ¶ 21, 304 Mont. 215, ¶ 21, 19 P.3d 817, ¶ 21. We use our inherent power of common law plain error review sparingly, on a case-by-case basis, and only in the aforementioned circumstances. *Finley*, 276 Mont. at 138, 915 P.2d at 215; *State v. Daniels*, 2003 MT 247, ¶ 20, 317 Mont. 331, ¶ 20, 77 P.3d 224, ¶ 20.

¶78 We conclude that Rosling's claim with respect to the prosecutor's remarks is not appropriate for plain error review. Not every inadvisable comment made by a prosecutor during a sentencing hearing results in a manifest miscarriage of justice, leaves unsettled the question of the fundamental fairness of the proceeding, or compromises the integrity of the judicial process. This is particularly true here, given that there is no indication in the record that the District Court took the prosecutor's remarks into consideration in

fashioning Rosling's sentence. Because the record does not support invoking plain error review, we will not consider this issue further.

## CONCLUSION

¶79 The District Court did not err in denying Rosling's motion to dismiss for insufficient evidence made at the close of the State's case with respect to all of the charges. Furthermore, the evidence at the conclusion of trial was sufficient for a rational trier of fact to find the elements of each charged offense beyond a reasonable doubt. The parole-eligibility restriction on Rosling's sentence is not illegal. Lastly, Rosling's claim regarding the prosecutor's reference during the sentencing proceeding to a swastika tattoo on Rosling's back is not properly before us, and we decline to address that claim under our common-law doctrine of plain error review.

¶80    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

Justice John Warner, concurring and dissenting.

¶81    I concur with the Court that the judgment convicting Rosling of the offenses of deliberate homicide, aggravated burglary, tampering with or fabricating physical evidence, and criminal possession of dangerous drugs must be affirmed. I, however, would vacate Rosling's conviction for the offense of aggravated kidnapping.

35

¶82    Under the Court's holding today, almost every murder could justify a kidnapping charge.  Generally speaking, murders typically take place away from other people – that is, in places of isolation.  Also, in any murder where death is not instantaneous, the victim has necessarily been restrained.  Indeed, as noted by other courts, taken to its logical extreme, the very act of killing another person is the ultimate form of restraint.  *See Wash. v. Green*, 616 P.2d 628, 636 (Wash. 1980).  Such an approach undermines the concept of kidnapping.

¶83    The purpose of a kidnapping statute, such as § 45-5-303, MCA, is to criminalize the act of kidnapping, an offense where the movement or secreting of the victim is a criminal end in itself:

> "[I]t is desirable to restrict the scope of kidnapping, as an alternative or cumulative treatment of behavior whose chief significance is robbery or rape, because the broad scope of this overlapping offense has given rise to the serious injustice . . . .  The blame cannot be placed exclusively at the door of the prosecutor for choosing to indict for kidnapping.  When an especially outrageous crime is committed there will always be public clamor for the extreme penalty which the laws permit, and it is precisely the obligation of penal legislators to minimize opportunities for such injustice by clearly and rationally restricting discretion to punish . . . .  It is necessary, therefore, to define an aggravated offense of kidnapping which shall consist of removal or confinement involving substantial isolation of the victim where the duration of the isolation, the intention of the kidnapper, or other circumstances makes the behavior specially terrifying and dangerous."

*N.J. v. Tronchin*, 539 A.2d 330, 333 (N.J. 1988) (quoting Final Report of the New Jersey Criminal Law Revision Commission, Final Report, Vol. II at 181-183, § 2C:13-1 (1971)).

¶84    Indeed, § 45-5-303(1)(c), MCA, states that the restraint must be for the separate purpose of inflicting injury or terrorizing the victim.  While the instant offense was

36

horrific, there is no evidence that moving Dooley within the house had any purpose other than to complete the offense of deliberate homicide. Instead, the evidence shows that the movement between two rooms was only a part of the same attack resulting in her death.

¶85  Because we have not previously dealt with this issue raised by Rosling, it is appropriate to look at how other jurisdictions have approached the question. Courts have struggled with whether movement of a victim during the commission of one crime can also constitute the separate offense of kidnapping. *See* Frank J. Wozniak, *Seizure or Detention for Purpose of Committing Rape, Robbery, or Other Offense as Constituting Separate Crime of Kidnapping*, 39 A.L.R.5th 283 (1996). Still, most courts hold kidnapping statutes do not apply to unlawful confinements or movements of the victim that are incidental to the commission of the other crime. *Md. v. Stouffer*, 721 A.2d 207, 212 (Md. 1998) (quoting Wozniak, 39 A.L.R.5th at 356); *see also e.g. Green*, 616 P.2d 628; *N.M. v. Vernon*, 867 P.2d 407 (N.M. 1993) (movement of victim by car to a remote location was incidental to victim's homicide and, thus, was not kidnapping); *Minn. v. Smith*, 669 N.W.2d 19 (Minn. 2003) (defendant blocking doorway during attack on victim was incidental to the actual homicide and, thus, not sufficiently criminally significant to warrant kidnapping charge); *Cal. v. Sheldon*, 771 P.2d 1330 (Calif. 1989) (movement of victim from garage into home too slight to constitute kidnapping); *N.C. v. Cartwright*, 629 S.E.2d 318 (N.C. App. 2006) (evidence insufficient to support conviction of kidnapping where defendant attacked victim in kitchen, then transported her to den). A bright-line rule is difficult to formulate and, thus, most cases turn on the particular circumstances:

> The one thing that seems clear from the decisions following the majority view is that most of them are fact-specific. Whether the confinement or movement of the victim is merely incidental to another crime depends, in nearly every case, on the circumstances . . . . If the victim is not moved too far, is not held for longer than is necessary to complete the other crime, and is not subjected to any significant peril from the confinement or movement itself, if the confinement or movement can reasonably be viewed as undertaken solely to facilitate the commission of the other crime, and if commission of the other crime normally involves (even if it does not legally require) some detention or asportation of the victim, the court is likely to conclude that the confinement or movement was merely incidental to the other crime and thus reverse a separate kidnapping conviction. If any of those factors are missing, however, there is a greater prospect of the court sustaining a separate kidnapping conviction.

*Stouffer*, 721 A.2d at 213-14 (citing *In re Earley*, 534 P.2d 721 (Cal. 1975); *S.D. v. Lykken*, 484 N.W.2d 869 (S.D. 1992)).

¶86    In this case, Dooley was not moved very far, only from her bedroom to her bathroom. There is no evidence that she was restrained for any longer than was necessary to kill her. Likewise, there is no evidence that she was restrained by being confined within either the bedroom or the bathroom. She was not subjected to any additional peril because she moved from one room to the other. It appears that the movement from the bedroom to the bathroom was only to facilitate the homicide. In addition, deliberate homicide by inflicting 100 stab wounds requires restraint of the victim only for long enough to accomplish the goal of death. In this particular case, all of the evidence indicates that the movement of Dooley between the bedroom and bathroom of her house was incidental to her homicide.

¶87    Nor is there evidence that the bathroom, with the door open, was intended to be a place of isolation. Likewise, there is no evidence Rosling had any purpose other than to

kill Dooley when she was somehow moved from her bedroom to her bathroom. Because § 45-5-303(1)(c), MCA, requires that the restraint of the victim be for a purpose separate from, or in addition to, that of killing her and not merely incidental to another crime, the evidence in this case is not sufficient to constitute the offense of both aggravated kidnapping and deliberate homicide.

¶88 In this case, while the attack started in the bedroom and was finished in the bathroom, the State has presented no evidence that moving Dooley to the bathroom had any particular end in itself, which § 45-5-303(1)(c), MCA, requires.

¶89 I conclude the evidence is insufficient to establish that Rosling restrained Dooley and moved her within the house for the purpose of secreting or holding her in a place of isolation to inflict bodily injury or terrorize her. Thus, Rosling's motion for a directed verdict on the charge of aggravated kidnapping should have been granted and I dissent from the Court's decision not to vacate that portion of the judgment convicting Rosling of aggravated kidnapping.

/S/ JOHN WARNER

Justices Patricia O. Cotter and Brian Morris join in the foregoing concurrence and dissent.

/S/ PATRICIA COTTER
/S/ BRIAN MORRIS