No. 04-190

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 308

STATE OF MONTANA,

        Plaintiff and Respondent,

  v.

TROY McGARVEY,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC-2003-014(C),
Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Wendy Holton, Attorney at Law, Helena, Montana

            Herman A. Watson, Attorney at Law, Bozeman, Montana

        For Respondent:

            Honorable Mike McGrath, Attorney General; C. Mark Fowler,
Assistant Attorney General, Helena, Montana

            Ed Corrigan, County Attorney; Lori Adams, Deputy
County Attorney, Kalispell, Montana

Submitted on Briefs: September 21, 2005

Decided:  December 6, 2005

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    On November 14, 2003, a jury convicted Appellant Troy McGarvey on two counts of deliberate homicide, based in significant part on an extrajudicial confession recounted by two trial witnesses. The court sentenced McGarvey to 100 years on each homicide count, with a consecutive additional ten years on each count for the use of a weapon. McGarvey maintained his innocence throughout all phases of the investigation, trial and sentencing, moving for a directed verdict at the close of the State's case. On appeal, McGarvey argues that the District Court erred in denying McGarvey's motion for a directed verdict because the evidence was insufficient as a matter of law to support the verdict. We affirm.

## FACTUAL BACKGROUND

¶2    Clifford Grant and Norman Nelson died from multiple gunshot wounds at Grant's twenty-acre property near Ferndale, Montana, in July of 2001. Grant tightly guarded his property, kenneling over fifty pit bulls and posting signs on the locked gates reading "No Trespassing" and "Beware of Dogs." Motion detectors and security lights lined the perimeter fence within the property. Grant lived in an enlarged mobile home, while Nelson, for several months prior to the murders, resided in a camper trailer on the property. An additional trailer home had been occupied at different times by two men from Yakima, Washington—Tony Sanchez and Louis Rodriguez. Sanchez had been running methamphetamine between Yakima and the Flathead Valley, Montana, for at least two years prior to the murders and had regularly supplied methamphetamine to Grant, making personal deliveries to the property approximately every two weeks.

2

¶3     On the day of the homicides, Sanchez and his sixteen-year-old nephew, Arnoldo Lopez, drove to Grant's property to retrieve Sanchez's truck and jet skis and to deliver a supply of methamphetamine. Sanchez and Lopez both testified that upon their arrival, Appellant McGarvey, whom they had never met before, came from around the west side of Grant's property and told them that he had knocked on Grant's door but received no answer. According to Lopez (though not Sanchez), McGarvey, without prompting, mentioned setting off firecrackers in an attempt to wake Grant. At some point, Nelson noticed the three men on the property and came out from his camper trailer to greet them. Because Grant was apparently not home, Sanchez and Lopez both testified that they retrieved the truck (which required a jumpstart) and then left, leaving McGarvey and Nelson alone on the property.

¶4     Detectives first learned of the murders on July 12, 2001. Prompted by local rumors, law enforcement's investigation initially focused on the "Mexican Mafia." Approximately two weeks after the killings, however, Flathead County Sheriff's Office received a tip from an anonymous female caller who stated that she had overheard somebody in a bar named "Tony" or "Troy" bragging about having killed Grant and Nelson. The tipster said the man lived on Harmony Road and was Grant's cousin. McGarvey, a distant cousin to Grant and who resided on Harmony Road, thus became the focus of law enforcement's investigation. From the beginning, McGarvey denied any involvement with the homicides.

¶5     The State, in large part, based its case on testimony from Robert Armstrong and Stan Edwardson, Jr. Edwardson rented a shop building from McGarvey's mother and allowed Armstrong, his helper, to move his camper trailer to the site behind the shop. Both men

3

claimed that on the day of the killings, McGarvey confessed to shooting Grant and Nelson. Armstrong testified that he first overheard McGarvey tell McGarvey's step-son about "something bad [that] had happened down at Cliff's house," and then listened as McGarvey told his wife and Edwardson details of the killings. A heavy drinker, Armstrong admitted to being "half lit" at the time he overheard these conversations. According to Armstrong, McGarvey said he went to Grant's property and while conversing with Grant at the west door, Grant "flipped out"—perhaps because he was on methamphetamine—and pulled a gun on McGarvey. Armstrong testified that McGarvey said a wrestling struggle ensued, resulting in Grant "popp[ing] off a couple rounds, one round on either side of his head," at which point McGarvey "wrestled the gun back away from [Grant] and shot him a few times." Armstrong testified that McGarvey claimed to have shot Nelson only after seeing Nelson running to a car, because McGarvey "thought [Nelson] either had a shotgun in his hand or he was reaching for the shotgun out of the car." Armstrong thought McGarvey said he threw the murder weapon into the river.

¶6     Armstrong further testified that a few days after overhearing McGarvey confess, he told his mother, Susan Fox, of the homicides, hoping she would offer him a place to live—which she did. After residing in the motor home on McGarvey's property for another couple weeks, Armstrong moved in with his mother. Approximately ten days after hearing from her son, Fox phoned in the anonymous tip implicating McGarvey. Law enforcement did not obtain details from Armstrong, however, until police arrested him on a fourth offense of driving under the influence (DUI), a felony, and a hit-and-run accident. Armstrong

4

promised testimony against McGarvey and subsequently received a deferred prosecution on his felony DUI. He also inquired of authorities about receiving a Crime Stopper's reward for providing information about the unsolved homicides. Prior to McGarvey's trial, in an effort to avoid testifying, Armstrong twice jumped bail before law enforcement revoked his suspended sentence. At some point while in jail, Armstrong wrote a letter to McGarvey demanding payment of $3,900 for some property he claimed McGarvey stole and damaged. The letter suggested that McGarvey push back the trial date so that Armstrong could take care of his "stuff." At trial, Armstrong indicated that he wanted to avoid testifying at McGarvey's trial and thus, needed the money in order to "run." In exchange for cooperating with the prosecution, the State deferred prosecution on Armstrong's felony DUI charge and dropped the bail-jumping charges, giving him a five-year suspended sentence.

¶7     As for Edwardson, he did not implicate McGarvey when detectives initially questioned him regarding the homicides—even though the prosecution threatened to charge him with obstruction of justice if he remained silent. Although Edwardson originally refused to cooperate, he eventually changed his mind and provided an interview. With regard to McGarvey's confession, Edwardson's testimony at trial was substantially similar to Armstrong's. He explained that on the day of the homicides, McGarvey "started telling me how he shot these two people down in Ferndale." According to Edwardson, Armstrong was present for about half the conversation, which lasted approximately twenty or thirty minutes. While he could not remember the victims' names, Edwardson said McGarvey identified one of the men as McGarvey's cousin. Edwardson speculated at trial that McGarvey had killed

5

Grant for writing a bad check. (Trial witness Dallas Koepfli also stated that McGarvey appeared angry with Grant around the date of the homicides.) Edwardson testified that after hearing about the deaths, he suggested retrieving drugs and money from Grant's property. Armstrong took off in his truck for that purpose, but on the way, changed his mind and picked up beer instead.

¶8 McGarvey maintained his innocence throughout all phases of the investigation, trial and sentencing. At trial, McGarvey claimed that on the morning of the homicides, he visited an occupational therapist for a finger injury suffered during a work-related accident. After the appointment, McGarvey called Grant to find out about the title to a Jeep that Grant had given McGarvey in lieu of money for work McGarvey had done on Grant's property. (Grant had previously written McGarvey a bad check for the work.) After leaving a message by phone, McGarvey drove to Grant's property, but claimed he decided to come back later, rather than approach the gates at that time. McGarvey testified that during his lunch break he drove to Grant's property and sat in his car by the gate eating lunch when Sanchez and Lopez arrived a few minutes later. According to McGarvey, Nelson opened the gate for all three men and allowed the cars to drive onto the property. Sanchez's truck required a jumpstart; after it started, McGarvey said he walked to the west side of Grant's house intending to knock on the door. When a chained pit bull lunged at him, however, McGarvey decided otherwise and told Nelson he would stop by again after work. In contradiction to Sanchez's and Lopez's testimony, McGarvey testified that he left Grant's property first, while the other two men remained behind with Nelson. McGarvey stated that he returned

6

to Grant's property after work, gaining entry by climbing over the fence. After seeing Nelson's body in the car, McGarvey said he fled the property, frightened by the sight, and once at home, told Edwardson about Nelson's corpse. While Edwardson expressed an interest in retrieving drugs from Grant's place, McGarvey claimed he wanted no part of such plans. McGarvey testified that he did not report to law enforcement because he was on probation and feared association with criminal activity. After the homicides, McGarvey evicted Edwardson for failing to pay rent on the shop building. Because Armstrong never had permission to move onto the property, McGarvey asked Edwardson to tell Armstrong to leave, as well.

¶9     When law enforcement first investigated the crime scene, they discovered Grant's body face-up on the ground near a dog kennel outside the west entrance of his residence. In searching Grant's home, officers turned up two empty carrying cases for .357 Dan Wesson revolvers. Detectives discovered in Nelson's camper a fully loaded Dan Wesson .357 revolver wrapped in a blanket. They also found bullet parts under Nelson's mattress that matched the same class of ammunition stored in Grant's Dan Wesson gun case. Law enforcement determined that the .357 Dan Wesson revolver in Nelson's trailer matched one of Grant's missing guns; the second revolver was never recovered. Experts estimated that either a .38 or .357 caliber weapon was used in killing Grant.

¶10     Nelson's body was found in a half-kneeling, half-sitting position in the driver's seat of a vehicle parked on the property; the driver and passenger windows to the vehicle were down and blood remained splattered inside the vehicle. Detectives noted that Nelson had

7

been shot two times—in the left temple and left jaw. While the range from which the shooting took place could not be determined precisely, the assailant apparently did not fire from close range. The investigation did not turn up a murder weapon; nor did it reveal the perpetrator's fingerprints, footprints or trace evidence, such as hairs or fibers from clothing or skin.

¶11 During the trial, at the close of the State's case-in-chief, McGarvey moved for a directed verdict pursuant to § 46-16-403, MCA, arguing that the State failed to "identify Mr. McGarvey as the person who has been referred to in these matters, . . . establish that the matter occurred in Flathead County; . . . [or] establish or identify a weapon which caused the deaths." The court denied the motion without explanation. At the conclusion of the three-day trial, the jury convicted McGarvey of two counts of deliberate homicide. The court sentenced McGarvey to 100 years on each homicide count, with a consecutive additional ten years on each count for the use of a weapon. The sentences are to run concurrently with no parole restriction.

## ISSUE

¶12 Whether the District Court properly denied McGarvey's motion for a directed verdict.

## STANDARD OF REVIEW

¶13 "A district court's decision to grant or deny a motion for a directed verdict lies within its sound discretion and will not be overturned absent an abuse of that discretion." *State v. Hayworth*, 1998 MT 158, ¶ 50, 289 Mont. 433, ¶ 50, 964 P.2d 1, ¶ 50 (internal quotation

omitted). "A directed verdict of acquittal is appropriate when the State fails to prove its case and there is no evidence upon which a jury could base a guilty verdict. No abuse of discretion occurs if, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Giant III*, 2001 MT 245, ¶ 9, 307 Mont. 74, ¶ 9, 37 P.3d 49, ¶ 9 (citations omitted).

## DISCUSSION

¶14    McGarvey argues on appeal that, as a matter of law, the evidence presented at trial did not sufficiently support the guilty verdict, and therefore, the District Court should have granted his motion for a directed verdict of acquittal. McGarvey's primary contention is that Armstrong and Edwardson, the two witnesses who testified to McGarvey's alleged extrajudicial confession, were patently unreliable and therefore corroboration should have been required in order to uphold their testimony.

¶15    At the outset, we note the State's argument that McGarvey failed to preserve this issue for appeal because he "never raised the claim that the two confession witnesses ought *as a matter of law* to be held unworthy of credit." We disagree with the State and conclude that McGarvey's appeal is appropriately before us. "In order to properly preserve an issue for appeal, a defendant must make a timely objection or motion to strike. For an objection to be timely, it must be made as soon as the grounds for the objection become apparent." *State v. Whitlow* (1997), 285 Mont. 430, 442, 949 P.2d 239, 247 (citations omitted). At the close

9

of the State's case-in-chief, McGarvey's trial counsel moved for a directed verdict, arguing the following:

> The State has failed in its efforts to establish or identify a weapon which caused the deaths of these individuals. There is no physical evidence which connects Mr. McGarvey in any respect to the events with which he is charged. The–frankly, the only evidence presented to this court is the testimony of two highly incredible individuals whom the State itself has impeached in regard to their credibility.
>
> So, Your Honor, there is no evidence at this time that would warrant this matter being submitted to the jury for its consideration.

By moving for a directed verdict based on insufficiency of the evidence after the State concluded its case-in-chief, McGarvey preserved the issue for appeal.

¶16 Turning to McGarvey's argument, we begin by addressing the case law upon which McGarvey relies as a basis for his assertion that insufficient evidence existed to support his conviction—specifically, because Armstrong's and Edwardson's testimony was not corroborated by any independent evidence. McGarvey directs us to federal case law, arguing that "[c]ourts in the United States generally refuse to allow a conviction based solely on testimony that a defendant confessed." McGarvey first cites *Opper v. United States* (1954), 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101, 109, for the proposition that a defendant's confession may only serve as the sole basis for a conviction if the prosecution presents sufficient independent corroboration supporting the essential facts of the confession to justify a jury inference of its truth. As McGarvey notes, a decade later the Court explained the reasons for holding confessions to a stricter standard in *Escobedo v. Illinois* (1964), 378 U.S. 478, 488-89, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977, 985: "We have learned the lesson of

10

history, ancient and modern, that a system of criminal law enforcement, which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." In *United States v. Lopez-Alvarez* (9th Cir. 1992), 970 F.2d 583, 589, 592, the Ninth Circuit developed a two-pronged test to address the problem of false confessions by requiring adequate corroboration of a defendant's admissions. The first prong of the *Lopez-Alvarez* test instructs the State to "introduce sufficient evidence to establish that the criminal conduct at the core of the offense has occurred," while the second prong instructs the prosecution to "introduce independent evidence tending to establish the trustworthiness of the admissions, unless the confession is, by virtue of special circumstances, inherently reliable." *Lopez-Alvarez*, 970 F.2d at 592. McGarvey correctly notes that Montana law encompasses the first prong of the *Lopez-Alvarez* test, but not the second prong. *See* §§ 45-5-111 and 46-16-215, MCA. McGarvey urges this Court to adopt the second prong—that is, require independent, corroborating evidence to establish the trustworthiness of a defendant's alleged extrajudicial confession.

¶17 We conclude that McGarvey's reliance on *Lopez-Alvarez*, as well as *Opper* and *Escobedo*, is misplaced. While these cases are useful for understanding why a confession obtained by law enforcement should be regarded with caution, they are inapposite to the circumstances of McGarvey's case. The Supreme Court and Ninth Circuit discussions that McGarvey cites deal with the trustworthiness of *the defendant's confession when obtained by law enforcement,* opposed to the reliability of a lay witness testifying to a defendant's

11

confession. This distinction is important because of the policy reasons behind the federal decisions. "The requirement of corroboration [where the defendant has confessed to law enforcement] arises from the high incidence of false confessions and the resulting need to prevent errors in convictions based upon untrue confessions alone." *Lopez-Alvarez*, 970 F.2d at 589 (citation omitted). McGarvey does not ask this Court to address the reliability of a statement he made to the police, but rather, the credibility of two prosecution witnesses—both of whom did not want to come forward—claiming to have heard McGarvey confess. Because we conclude that the federal case law on which McGarvey relies is inapposite, we do not address the question of whether to adopt the second prong of the *Lopez-Alvarez* test.

¶18    Although we distinguish the federal case law on which McGarvey relies, we are still left to decide whether the District Court appropriately denied McGarvey's motion for a directed verdict given the evidence presented at trial. Viewing the evidence in a light most favorable to the prosecution, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Giant*, ¶ 9 (citations omitted).

¶19    We conclude that the State provided sufficient evidence for a trier of fact to have determined McGarvey's guilt beyond a reasonable doubt. In addition to Armstrong's and Edwardson's testimony that McGarvey confessed to the murders, the State presented the following evidence at trial: the time of the victims' deaths; McGarvey's presence at the murder scene; witness testimony that McGarvey was angry with Grant at the time of the

homicides; testimony from Sanchez and Lopez, who interacted with McGarvey at the murder scene; and testimony from Armstrong's mother and Edwardson's sister that the two men appeared distraught by McGarvey's confession. The jury, not this Court, determines the credibility of trial evidence.

> "As this Court has held many times over, the jury is the fact finding body in our system of jurisprudence, and its decision is controlling. The jury is free to consider all the evidence presented and to pick and choose which of the witnesses it wishes to believe. If sufficient testimony was introduced, as well as exhibits to justify the jury's findings, then its conclusions will not be disturbed unless it is apparent there was a clear misunderstanding by the jury or that there was a misrepresentation made to the jury."

*State v. Lucero* (1984), 214 Mont. 334, 338, 693 P.2d 511, 513 (quoting *State v. Swazio* (1977), 173 Mont. 440, 445, 568 P.2d 124, 127).

¶20  The State's trial presentation involved myriad evidence, which taken as a whole implicated McGarvey's guilt. McGarvey had the opportunity to refute the State's case with opposing evidence. The jury found the State's case more compelling. Having reviewed the record, we hold that a rational trier of fact could have found McGarvey guilty beyond a reasonable doubt. We affirm the denial of McGarvey's motion for directed verdict.

¶21  Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER

13

/S/ BRIAN MORRIS