# TROY MCGARVEY,
## Petitioner and Appellant,
### v.
# STATE OF MONTANA,
## Respondent and Appellee.

No. 13-0062.
Submitted on Briefs May 21, 2014.
Decided July 15, 2014.
2014 MT 189.
375 Mont. 495.
329 P.3d 576.

For Appellant: **Wendy Holton**, Attorney at Law, Helena.

For Appellee: **Timothy C. Fox**, Montana Attorney General, **Tammy A. Hinderman**, Assistant Attorney General, Helena; **Ed Corrigan**, Flathead County Attorney, Kalispell.

JUSTICE WHEAT delivered the Opinion of the Court.

¶1 Troy McGarvey (McGarvey) appeals the District Court's denial of his petition for postconviction relief (PCR).

¶2 The following issues are presented for review:

¶3 *Did the District Court err in concluding that the State had not failed to disclose relevant exculpatory and impeachment evidence?*

¶4 *Did the District Court err in concluding that McGarvey had not received ineffective assistance of counsel?*

¶5 *Is McGarvey entitled to a new trial under the cumulative error doctrine?*

¶6 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 The State charged McGarvey with two counts of Deliberate Homicide for the deaths of Clifford Grant (Grant) and Norman Nelson (Nelson). The jury convicted McGarvey on both counts after a three-day trial in November 2003. McGarvey appealed that conviction to this Court and we affirmed in *State v. McGarvey*, 2005 MT 308, 329 Mont. 439, 124 P.3d 1131. McGarvey filed a PCR petition in the District Court alleging that the State had failed to disclose exculpatory and impeachment evidence relevant to the case and also that his trial

attorneys had rendered ineffective assistance of counsel (IAC). The District Court held a hearing on April 25 and 26, 2011, and denied McGarvey's PCR petition. McGarvey now appeals.

¶8 At trial, the State relied heavily on the testimony of Robert Armstrong (Armstrong) and Stan Edwardson (Edwardson), who both testified that McGarvey had told them that he shot Grant and Nelson. McGarvey's PCR petition alleges that the State withheld impeachment evidence relating to Armstrong and Edwardson and that his attorneys, Gregory Jackson (Jackson) and Don Vernay (Vernay) failed to adequately impeach either witness on cross-examination.

¶9 In 2003, prior to McGarvey's trial for homicide, Armstrong had pled guilty to felony theft. Susan Fox (Fox), Armstrong's mother, appeared at his sentencing for that crime and testified that she believed Armstrong suffered from forgetfulness and was easily overcome by stress as a result of electrocution. Although the State provided a transcript of Armstrong's change of plea hearing to McGarvey's defense, the State did not provide the defense with the transcript of Armstrong's sentencing hearing, or the letter written by Fox. Armstrong also kept extensive notes while he was in prison. Among those notes was a stream-of-consciousness list beginning with the phrase "Admit to Schizo" and listing a handful of mental health issues associated with schizophrenia. All of Armstrong's notes were provided to the defense, but the State indicated to the defense that it did not believe the evidence was relevant for the purposes of the trial. At trial, the defense cross-examined Armstrong and impeached his credibility by establishing that he was receiving leniency on other criminal charges in exchange for his testimony and by establishing that he had lied in a prior court appearance. Armstrong and Fox also testified at the trial that Fox had made the initial tip to Crime Stoppers after Armstrong told her about McGarvey's confession.

¶10 In January 2002, Edwardson had twice told investigators that McGarvey did not confess to him. Edwardson then visited Rod Monroe (Monroe), who had been incarcerated on drug charges. After visiting Monroe, Edwardson told investigators that McGarvey had confessed to him while Monroe was present. Monroe and Edwardson were later charged in a scheme to produce methamphetamine in August 2003. At McGarvey's trial, Edwardson testified that only Armstrong and himself were present for McGarvey's confession. Defense counsel cross-examined Edwardson and impeached his credibility by establishing that he had changed his statements to law enforcement and that he owed McGarvey money.

¶11 Finally, the defense presented a theory at trial that the murders

had been committed by Saul "Tony" Sanchez (Sanchez) and/or other members of the "Mexican Mafia" because of a dispute stemming from the victims' production of methamphetamine. The defense presented evidence indicating that Sanchez was a drug dealer and that he was armed. The defense also established that Sanchez possessed a Toyota Celica, which had been identified as the same make as the vehicle driven by the killer. Sanchez testified that Grant owed him money and that he had called Grant around the time of the murders. Finally, the defense theorized that multiple shooters had been present at the scene of the crime, one of whom was firing a 9 mm, and established that Sanchez owned a weapon of that caliber.

¶12 McGarvey's PCR petition raised evidence relating to Sanchez that had not been presented at trial. In February 2002, Mary Leptich (Leptich) was interviewed by Lake County detectives regarding her involvement with methamphetamine distribution and Sanchez. Leptich told detectives that Sanchez had been involved in methamphetamine distribution and was well armed. Leptich also indicated that she believed Sanchez to be responsible for an assault on another drug dealer. Flathead County investigators involved with McGarvey's trial were apparently unaware of these interviews and did not disclose the interviews to defense counsel. Leptich was again interviewed in 2006, this time by an investigator hired by McGarvey. Leptich told this investigator that she believed Sanchez had murdered Grant because he had once told her that "what happened to Grant could happen to other people." Additionally, the mother of Sanchez's child, Ann Marie Matts, had filed a report with St. Ignatius police that Sanchez had threatened to kill her. The defense was unaware of this report, as was the State.

¶13 Finally, McGarvey's PCR petition relied substantially on the testimony of two inmates who had obtained information about the crime. Joseph Buck (Buck) shared a cell block with Armstrong and then McGarvey before the trial. Armstrong told Buck that McGarvey had found dead bodies at the crime scene and that Armstrong himself had gone to the crime scene to see. Buck then relayed this discussion to McGarvey while he awaited trial. McGarvey did not share this information with his counsel. Kenneth Gifford (Gifford) testified that a Mexican-American man had told him about Grant's murder and the murder had resulted from a drug debt. Gene Hulford (Hulford) had seen an older Hispanic man waiting outside of Grant's property three or four weeks before the homicides. This evidence was presented at the PCR hearing.

## STANDARD OF REVIEW

¶14 We review a district court's denial of a PCR petition for post-conviction relief to determine whether the court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *Sartain v. State*, 2012 MT 164, ¶ 9, 365 Mont. 483, 285 P.3d 407. We review discretionary rulings in PCR proceedings, including rulings related to whether to hold an evidentiary hearing, for an abuse of discretion. *State v. Morgan*, 2003 MT 193, ¶ 7, 316 Mont. 509, 74 P.3d 1047. We review de novo the mixed questions of law and fact presented by claims of ineffective assistance of counsel. *Weaver v. State*, 2005 MT 158, ¶ 13, 327 Mont. 441, 114 P.3d 1039. A petitioner seeking to reverse a district court order denying PCR based on ineffective assistance of counsel bears a heavy burden. *Sartain*, ¶ 9 (citing *Morgan*, ¶ 9).

## DISCUSSION

¶15 *Did the District Court err in concluding that the State had not failed to disclose relevant exculpatory and impeachment evidence?*

¶16 ▮ In all criminal cases the prosecution has a long-established duty to provide to the defense any exculpatory or impeachment evidence in its possession. *State v. Ellison*, 2012 MT 50, ¶ 15, 364 Mont. 276, 272 P.3d 646 (discussing *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963)); *State v. Cooksey*, 2012 MT 226, ¶ 34, 366 Mont. 346, 286 P.3d 1174. A party seeking to establish a *Brady* violation must establish that:

> (1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the petitioner did not possess the evidence nor could he have obtained it with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different.

*Gollehon v. State*, 1999 MT 210, ¶ 15, 296 Mont. 6, 986 P.2d 395. *See also State v. St. Dennis*, 2010 MT 229, ¶ 47, 358 Mont. 88, 244 P.3d 292 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999)). In examining whether the State possessed and suppressed evidence, "[t]he prosecutor's obligation of disclosure extends to material and information in the possession or control of members of the prosecutor's staff and of any other persons who have participated in the investigation or evaluation of the case." Section 46-15-322(4), MCA. Although investigators cannot hamper the accused's

right to obtain exculpatory evidence, police officers are not required to take initiative or assist the defendant with procuring evidence on his own behalf. *State v. Seiffert*, 2010 MT 169, ¶ 15, 357 Mont. 188, 237 P.3d 669 (citing *State v. Belgarde*, 1998 MT 152, ¶ 16, 289 Mont. 287, 962 P.2d 571). As a general rule, the State's obligation to disclose information under *Brady* does not impose a duty on the prosecutor or investigators to learn of information possessed by other jurisdictions or agencies that have no involvement in the investigation or prosecution at issue. *U.S. v. Morris*, 80 F.3d 1151, 1169-70 (7th Cir. 1996).

¶17 As to the second element, no *Brady* violation exists where both parties are aware of the existence of specific evidence and defense counsel could uncover the evidence with reasonable diligence. *State v. Parrish*, 2010 MT 212, ¶ 18, 357 Mont. 477, 241 P.3d 1041 (discussing *State v. James*, 2010 MT 175, ¶¶ 30-36, 357 Mont. 193, 237 P.3d 672). "In *James*, we concluded that since counsel for the defendant was generally familiar with booking procedures, counsel was constructively aware that a booking photo was probably in existence." *Parrish*, ¶ 18. Next, if the State has suppressed evidence, only a deliberate or intentional suppression of exculpatory evidence is a per se violation of due process under *Brady*. *Belgarde*, ¶ 16 (discussing *State v. Heth*, 230 Mont. 268, 272, 750 P.2d 103, 105 (1988)). "Negligently suppressed evidence only amounts to a violation of due process when it is material and of substantial use, vital to the defense, and exculpatory." *State v. Gollehon*, 262 Mont. 1, 13, 864 P.2d 249, 257 (1993). Regarding the final element, "reasonable probability" that the outcome would have been different is a question of whether such information could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kills on Top v. State*, 2000 MT 340, ¶ 33, 303 Mont. 164, 15 P.3d 422 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566 (1995)). The materiality of excluded evidence is considered collectively, not item by item. *Kyles*, 514 U.S. at 436, 115 S. Ct. at 1567.

¶18 McGarvey argues that the State failed to provide the defense with information concerning Armstrong's mental health such as the transcripts of the sentencing hearing, the contents of Armstrong's prison notes, and Fox's testimony concerning Armstrong's mental health. However, both parties were put on notice that this evidence existed and the defense could have discovered the evidence with reasonable diligence. The State provided the prison notes to the defense but indicated that they did not find them relevant. Although the notes may have been relevant to Armstrong's credibility, both

parties were aware of the evidence and could have ascertained its relevance with reasonable diligence. The defense was put on constructive notice of the existence of Armstrong's sentencing transcripts and could have discovered Fox's testimony therein. The State had provided transcripts of Armstrong's change of plea hearing, a procedure that generally leads to a sentencing hearing flush with evidence of a person's character and prior crimes. Counsel for McGarvey knew that Armstrong had been indicted for a crime and had pled guilty to it and, therefore, had constructive notice that the sentencing transcripts existed.

¶19 ■ Even if the prosecution had blinded the defense to this evidence, however, the evidence was wholly contrary to the defense's strategy. The defense painted Armstrong as a liar in pursuit of money and leniency by establishing that Armstrong had lied in a previous court appearance; that he was motivated to lie because he sought leniency on other charges; that he had attempted to use his testimony to extort money from McGarvey; that he wanted to receive a Crime Stoppers award; and that he had waited months before reporting McGarvey's confession to law enforcement. The evidence at issue would have presented Armstrong in a very different light as forgetful, irrational, delusional, and unable to handle even minor stress. Defense counsel feared that highlighting these attributes would have been confusing to the jury and could have contradicted the theory that Armstrong was intentionally lying to obtain benefits. Thus, the evidence here did not have a reasonable probability of influencing the outcome because the evidence would have bolstered a theory that the defense strategically chose to avoid. The District Court correctly concluded that the evidence at issue did not have a reasonable probability of creating a different outcome or undermining confidence in the verdict.

¶20 ■ McGarvey next argues that the State failed to disclose impeachment evidence concerning Edwardson's relationship with Monroe in a scheme to produce methamphetamine. McGarvey theorizes that Monroe and Edwardson could have been producing methamphetamine before January 2002, and because Monroe was in prison while Edwardson was not, Monroe could have used their common crime to coerce Edwardson into fabricating the story of McGarvey's confession so that Monroe could then use the information to barter a reduction of his sentence. At the PCR hearing, the District Court found that Edwardson had not been involved with Monroe in producing methamphetamine until after Edwardson had come forward to the police about McGarvey's confession, and therefore, the criminal

scheme was irrelevant to the case. That conclusion was supported by substantial evidence. Edwardson and Monroe were indicted for methamphetamine production occurring in July 2002. The investigation surrounding those offenses revealed that Edwardson's girlfriend had purchased materials for the methamphetamine operation in the spring of 2002, in preparation for Monroe's release from prison. All of this occurred well after Edwardson had informed the police of McGarvey's confession in January 2002. Critically, McGarvey points to no evidence showing that Monroe and Edwardson were producing methamphetamine together before Edwardson informed police of McGarvey's confession. Unsupported allegations and conclusions are not a basis for granting postconviction relief. *State v. Finley*, 2002 MT 288, ¶ 9, 312 Mont. 493, 59 P.3d 1132. Therefore, the District Court properly denied McGarvey's PCR petition as it relied on speculation and unsupported allegations concerning Monroe and Edwardson.

¶21 Next, McGarvey argues that the State withheld relevant evidence concerning Sanchez and the murders, namely, the Leptich interview and the Matts police report. The District Court concluded that, at the time of the trial, the State was unaware of the information provided by either Leptich or Matts and, at any rate, the information provided by those interviews had little relevance to the trial. That conclusion is well founded. First, Leptich's beliefs about Sanchez were just that: beliefs, unsupported by any evidence. Leptich told investigators that she had a "gut feeling" that Sanchez had been involved in the murders. Her feeling was supplemented by Sanchez's vague statement to her that "what happened to Grant could happen to other people." Affidavits filed by investigating officers noted that Leptich had no personal knowledge of any connection between the murders and Sanchez. Leptich's statements were likely inadmissible and useless on their own, but they were especially lacking in value considering the swath of other evidence that the defense employed to bolster its theory about Sanchez. The defense presented evidence that Sanchez owned a car identified as the killer's car; that he had been at the scene of the crime on the day of the crime to deliver drugs; that he was armed; that Grant had owed him money; that he had called Grant the day of the homicides; and that Sanchez had lied to investigating officers. In this context, Leptich's intuition about Sanchez would have only added speculation to hard evidence. The District Court correctly concluded that, in light of the evidence, Leptich's intuition would not have had any effect on the outcome of the trial. The same is true of the Matts report, which would have demonstrated that Sanchez had a propensity

for violence and was selling drugs; that character trait was thoroughly established by other evidence at trial. We agree with the District Court that this information was irrelevant to the trial and had no effect on the outcome.

¶22 The District Court also correctly concluded that the Matts and Leptich evidence had not been intentionally suppressed by the State. McGarvey made no showing at the PCR hearing that the State knew of, or had reason to know of, the Leptich or Matts reports prior to trial. Neither Flathead County nor the investigating officers were aware of Matts report to police, and they were not obligated to discover and disclose evidence obtained by another uninvolved jurisdiction. *Morris*, 80 F.3d at 1169. The affidavits and evidence presented at the PCR hearing demonstrated that the State and its investigators found no relevant information in the Leptich interview or the Matts report. Further, only a deliberate or intentional suppression of exculpatory evidence is a per se violation of due process under *Brady*. *Belgarde*, ¶ 16 (citing *Heth*, 230 Mont. at 272, 750 P.2d at 105). Otherwise, the negligent suppression of evidence only amounts to a *Brady* violation when it is "material and of substantial use, vital to the defense, and exculpatory." *Gollehon*, 262 Mont. at 13, 864 P.2d at 257. As discussed above, the evidence at issue here had very little value to the defense because it was inadmissible, speculative, and only served to attack Sanchez's character. Finally, McGarvey claims that investigators should have pursued more information on Sanchez by following the leads provided by Matts and Leptich. However, "police officers are not required to take initiative or even assist the defendant with procuring evidence on his own behalf." *Seiffert*, ¶ 15 (citing *Belgarde*, ¶ 16). The officers here had no duty to seek more information from Matts or Leptich, and such a pursuit would have been based on speculation rather than hard evidence. McGarvey's PCR petition did not fulfill the elements of a *Brady* violation, and was properly denied.

¶23 *Did the District Court err in concluding that McGarvey had not received ineffective assistance of counsel?*

¶24 We employ the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), to determine whether a criminal defendant has received ineffective assistance of counsel. *State v. Miner*, 2012 MT 20, ¶ 11, 364 Mont. 1, 271 P.3d 56. Under this test, the defendant must demonstrate (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant. *Miner*, ¶ 11. IAC claims must be grounded on facts in the record and not on mere conclusory allegations. *Finley*, ¶ 9. If an insufficient showing is made regarding

one prong of the test, there is no need to address the other prong. *Dawson v. State*, 2000 MT 219, ¶ 21, 301 Mont. 135, 10 P.3d 49.

¶25 Under *Strickland*'s first prong, we examine whether counsel's conduct fell below an objective standard of reasonableness considering prevailing professional norms, and in the context of all circumstances. *Whitlow v. State*, 2008 MT 140, ¶ 14, 343 Mont. 90, 183 P.3d 861. Counsel's conduct is strongly presumed to be within professional norms, and a plaintiff must "'identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.'" *Whitlow*, ¶ 16 (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066). We then examine these acts or omissions in light of all circumstances to determine whether counsel's performance falls below the standard of reasonable professional conduct. *Whitlow*, ¶ 16. Counsel's decisions related to presenting the case, including whether to introduce evidence or produce witnesses, generally constitute a matter of trial tactics and strategy, and we will not find ineffective assistance of counsel in such tactics. *Weaver*, ¶ 25.

¶26 Under *Strickland*'s second prong, we examine whether there is a reasonable probability that counsel's lack of reasonable professional conduct renders the trial result unreliable or the proceedings fundamentally unfair. *Miner*, ¶ 12. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

### A. *Examination of Edwardson, Armstrong, and Fox*

¶27 McGarvey alleges that his counsel was ineffective for failing to cross-examine Armstrong about who was present when McGarvey confessed. Armstrong had changed his story concerning whether McGarvey's wife, Gena, was present for the confession. Additionally, Armstrong's account of the individuals present did not match Edwardson's account. McGarvey's counsel testified at the PCR hearing that the attorneys in the case were aware of Armstrong's inconsistencies. The attorneys decided that questioning Armstrong on this topic ran the risk of revealing that Gena was present for the confession. The defense had taken considerable efforts to protect Gena from testifying because "frankly, we didn't feel that Gena could have withstood cross-examination." The defense sought to exclude Gena's statement, "holy s[***], he really did it," and felt that she was otherwise unconvincing on the stand. The defense discussed the decision with McGarvey and Gena before deciding to exclude any mention of Gena in the trial. As a result, the defense avoided questioning Armstrong on inconsistencies in his statement because it

could raise a discussion of whether Gena was present for the confession. The decision to forego questioning Armstrong on this inconsistency was plainly a strategic decision, tailored to prevent raising a slew of questions in the jurors' minds as to whether Gena was present for the confession, why she did not testify, and what she had said about the confession. That strategic move was reasonable under the circumstances of the case to prevent introducing Gena into the trial.

¶28 McGarvey also complains that his counsel failed to impeach Armstrong on the grounds that the details of the homicides were easily ascertained by reading newspaper articles. At the PCR hearing, Jackson explained that, while Armstrong's details were not confirmed by physical evidence, he knew specific details that were later confirmed by the investigation. For instance, Armstrong testified that McGarvey confessed to shooting Grant in the head while Grant was laying down after a struggle over the gun—details that were not included in the newspapers. Jackson noted that the coroner's report showed that Grant suffered gunshot wounds at close range and after a fight, confirming Armstrong's account of McGarvey's confession. Armstrong also testified that McGarvey confessed to shooting Nelson because he believed that Nelson was running to retrieve his shotgun, as Nelson had a habit of carrying around a shotgun with a flashlight taped to it. Nelson's reputation for carrying this weapon was later confirmed by investigators as was the fact that Nelson was shot from a greater distance than Grant. In this context, McGarvey's counsel could have attempted to impeach Armstrong, but risked pinpointing specific details that could cement Armstrong's credibility and hamstring the defense's narrative that he was a liar. The defense made a reasonable strategic decision in foregoing examination of Armstrong on newspaper articles and the details of the confession.

¶29 Next, McGarvey alleges that his counsel should have questioned Fox concerning her motives for making the Crime Stoppers call. McGarvey argues that Fox shifted her reason for making the call, first asserting that she and Armstrong agreed that she would make the call because Armstrong was too upset after hearing the confession, but then also stating that she made the call without Armstrong's knowledge in order to protect him from being implicated in the investigation at all. The District Court found that the defense acted reasonably in deciding that these inconsistencies were "of little or no significance." We agree. The reasons that Fox gave for making the call are not mutually exclusive; she could have tried to shield her son from involvement in the homicides and also thought that he was too upset

to make the call. Under either reason that Fox gave for making the call, there is a consistent narrative that she was trying to protect her son from being implicated in the investigation. Concerning whether Armstrong knew that Fox made the call, that inconsistency also fits into Fox's testimony that she wanted to shield her son from investigation or from criminal charges for failing to immediately relay the confession to police. The defense properly considered these discrepancies and concluded that they made no contribution to the trial strategy. Rather, the defense attacked Fox's credibility by showing that Fox had lied about being the tipster, that she had intentionally given misleading information in the tip, and that she had wanted to prevent police from investigating Armstrong. In this context, questioning Fox on a minor inconsistency would contribute little to the case.

¶30 McGarvey next points out that the defense failed to question Edwardson concerning his inconsistent statements, especially his shifting story concerning whether Monroe was present for the confession. Specifically, McGarvey contends that his counsel should have examined Edwardson on whether Monroe had colluded with, or coerced, Edwardson into fabricating the entire story of McGarvey's confession. On cross-examination counsel established that Monroe had asked Edwardson to say that he was present for the confession. Counsel also established that Edwardson had lied, had consistently tried to mislead law enforcement, and was on bad terms with McGarvey over financial issues. Finally, no evidence supported the theory that Monroe and Edwardson had colluded to fabricate the confession or that Monroe had coerced Edwardson into fabricating the confession. It is well within the norms of reasonable professional conduct for counsel to limit their cross-examination to the facts of the case rather than resorting to speculation unsupported by evidence. McGarvey's counsel was entirely reasonable for declining to pursue this theory and instead seeking to impeach Edwardson based on established facts.

### B. Expert Witness

¶31 McGarvey also takes issue with the decision not to hire a forensic expert to examine the bodies of Grant and Nelson. McGarvey argues that such a witness could have established that multiple shooters were present based on the nature of the gunshot wounds and the presence of knife damage on Grant's face. The defense concluded that an expert witness was not needed because they felt they could establish that two shooters were present by cross-examining the State's witnesses. At the PCR hearing, expert witness Kay Sweeny testified for the defense. She

said that Grant's face showed signs of being cut with a knife in addition to being shot. Dr. Gary Dale, the coroner who had originally examined the bodies, explained that the signs of cutting were easily explained by the presence of several dogs on the property. Dr. Dale presented pictures of other bodies that had been ravaged by dogs and compared those marks to those found on Grant. Based on this comparison, Dr. Dale concluded that a knife could have been present, but the marks and tears were more consistent with a dog bite. Based on this testimony, the District Court concluded that Sweeny's conclusions were not credible and that the defense had properly declined to involve an expert. That conclusion is well supported. The defense was able to establish a theory that multiple shooters had committed the crime by examining Dr. Dale and raising questions about the weapon used and the distance from which the weapon was fired. The inclusion of another expert would have only reiterated the ambiguity that Dr. Dale expressed in his testimony. Further, Dr. Dale could have easily discredited any theory involving a knife, as he did in the PCR hearing. Presenting such a questionable theory could have damaged the credibility of the defense and bolstered Dr. Dale's credibility. The defense made a reasonable strategic decision in declining to hire an expert witness on these grounds.

*C. Other Witnesses*

¶32 McGarvey's PCR petition also relied heavily on the defense's failure to discover the testimony of Buck, Gifford, and Hulford. Buck's testimony confirmed the fact that Armstrong had heard about the homicides from McGarvey, a fact that the defense sought to disprove. The District Court concluded that the testimony of Gifford and Hulford was plain hearsay and would not have been admitted at trial. This conclusion is correct. Both Hulford and Gifford would have testified as to what different persons had said to them about Grant. Even if counsel was deficient for failing to obtain this testimony, the inadmissibility of that testimony means that it could not have had an effect on the trial and, therefore, that McGarvey suffered no prejudice as a result of its absence.

¶33 McGarvey also alleges ineffective assistance because the defense did not call for testimony from Gena or from Kelsey Nichols (Nichols), McGarvey's step-son. Counsel discussed the decision not to call Gena with the McGarveys before concluding that Gena's testimony would be harmful to the defense. Nichols, who was thirteen at the time, had warrants out for his arrest and refused to return to the jurisdiction in order to testify. Counsel determined that Nichols' testimony had little value because he could only testify to the fact that he had not heard

any confession. When Nichols did testify at the PCR hearing, he stated that he did not remember hearing any confession from McGarvey, confirming his attorneys' suspicion that Nichols' testimony would have had no value at trial. Accordingly, counsel's decision to forego calling Gena or Nichols was a reasonable trial tactic to preserve the credibility of the defense and weed out unnecessary or confusing testimony.

¶34 ■ As a final matter, McGarvey argues that his counsel should have conducted a reasonable investigation into the evidence that the State failed to disclose. As we concluded above, none of this evidence would have produced a different outcome at the trial. Each piece of evidence was dubiously relevant and served to impeach witnesses who had already been thoroughly impeached. Therefore, even if we assumed that counsel did not exercise reasonable professional conduct, that failure did not prejudice the defendant because it does not raise a reasonable probability that the outcome would have been different had the evidence been discovered.

¶35 *Is McGarvey entitled to a new trial under the cumulative error doctrine?*

¶36 ■McGarvey invokes the cumulative error doctrine to argue that, if any one of these errors would not have changed the outcome of the trial, the sum of all the alleged errors could have added up to sufficient prejudice. "The doctrine of cumulative error requires reversal of a conviction where a number of errors, taken together, prejudiced a defendant's right to a fair trial." *State v. Ferguson*, 2005 MT 343, ¶ 126, 330 Mont. 103, 126 P.3d 463. The existence of prejudice, however, must be established by the defendant, as mere allegations of error without proof of prejudice are inadequate to satisfy the doctrine. *State v. Larson*, 2004 MT 345, ¶ 65, 324 Mont. 310, 103 P.3d 524 (quoting *State v. Campbell*, 241 Mont. 323, 329, 787 P.2d 329, 333 (1990)). As discussed above, McGarvey failed to adequately establish some degree of prejudice from any of the individual errors; he cannot claim to have established prejudice from the sum of the errors. We see no reason to reverse this case under the cumulative error doctrine.

## CONCLUSION

¶37 The District Court's findings of fact were supported by substantial evidence and its conclusions of law are correct. The court properly denied McGarvey's PCR petition. We affirm.

CHIEF JUSTICE McGRATH, JUSTICES McKINNON, COTTER and BAKER concur.