FILED

12/06/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0611

DA 16-0611

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2017 MT 296

STATE OF MONTANA,

      Plaintiff and Appellant,

    v.

JASON TERRONEZ,

      Defendant and Appellee.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DC-2015-18
Honorable Randal I. Spaulding, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General; Helena, Montana

          Thomas P. Meissner, Fergus County Attorney, Jean A. Adams, Deputy
Fergus County Attorney; Lewistown, Montana

      For Appellee:

          Michael J. Sherwood, Michael J. Sherwood, P.C.; Missoula, Montana

Submitted on Briefs:  October 4, 2017

Decided:  December 6, 2017

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 The State of Montana appeals from the order entered by the Tenth Judicial District Court, Fergus County, granting Defendant Jason Terronez' (Terronez) motion to withdraw his guilty plea. We affirm, addressing the following issues:

1. *Is the State authorized to appeal the District Court's order granting Terronez' motion to withdraw his guilty plea?*

2. *Did the District Court err by determining that good cause existed to permit Terronez to withdraw his guilty plea?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶2 David and Sunnshine Welton are both dentists and owned Montana Family Dentistry in Lewistown, Montana. They have two children: a girl, L.W. and a boy, M.W. Dana and Jason Terronez are nurses and worked at Central Montana Medical Center in Lewistown. They have four children: three girls and one boy. Dana and Terronez were patients at the Weltons' dental clinic and the families became close friends—sharing meals, weekend gatherings, and holidays.

¶3 Sunnshine was sexually abused as a child, which made her apprehensive about letting her children participate in sleepovers with other families. She described herself as a "paranoid" mom who is hypersensitive about sexual abuse issues. As a precaution, Sunnshine educated her children about "good touch" and "bad touch" and initiated such conversations with them every six months. However, she trusted Terronez and Dana, and had permitted her daughter, five-year-old L.W., to sleep over at the Terronez household prior to the incident in question. On March 7, 2015, she again allowed L.W. to sleep over

2

at the Terronez residence. L.W. watched a movie with Terronez and his three girls, including Terronez' oldest daughter, nine-year-old A.T. Dana was in and out of the living room while the others watched the movie, during which Terronez was seated next to L.W. After the movie, Dana asked L.W. if she wanted to go home, and L.W. said she wanted to stay at the Terronez household.

¶4 On March 8, L.W. was sitting on the toilet and told Sunnshine it hurt when she peed. L.W. also reported that, while bathing, her vagina hurt. On March 10, L.W. again complained that her vagina hurt, and Sunnshine washed it. On March 11, L.W. told Sunnshine that, during the movie at Terronez' house, Terronez had put his hand into her pajamas and touched her vagina. Sunnshine informed David, and then immediately reported this to the Lewistown Police Department. The same day, Sunnshine took L.W. to her physician, Dr. Bolstad, for a sexual abuse examination. Because more than 72 hours had lapsed since the reported contact, Dr. Bolstad did not collect biological evidence. The examination revealed L.W.'s external genitalia was normal, but internally there were four discrete areas of injury. Dr. Bolstad diagnosed the injuries as sexual abuse based on the areas of injury and what L.W. reported.

¶5 Officer Jenness interviewed A.T., who had also been in the room watching the movie at the Terronez residence. A.T. initially stated that, during the movie, she was sitting next to Terronez, but later admitted she lied to prevent Terronez from getting into trouble. However, none of Terronez' daughters or Dana reported they had seen Terronez do what L.W. had reported. At defense counsel's request, Officer Jenness also interviewed

3

Sunnshine's brother-in-law, Jeremy Baxter, as a possible suspect. Baxter had watched L.W. and M.W. a week prior to the sleepover. Sunnshine had commented that Baxter looked like a pedophile, but later said her comment was meant as a joke. This inquiry by police did not yield any evidence implicating Baxter. Other males in L.W.'s life at the time were her brother, seven-year-old M.W., and her father, David.

¶6 On March 12, the State charged Terronez with one count of sexual intercourse without consent via digital penetration. On March 16, Honorable Jon A. Oldenburg, District Judge, recused himself from the case after David confronted him at a local restaurant, and Honorable Randal I. Spaulding assumed jurisdiction of the case. Terronez was initially represented by attorney Craig Buehler, but on April 6, a notice of substitution of counsel was filed indicating that Jeffry Foster had assumed representation of Terronez. Foster filed a motion for change of venue, arguing a reasonable apprehension existed that Terronez could not receive a fair trial in Fergus County because of: (1) the small size of the Fergus County jury pool; (2) the heinous nature of the crime; (3) both families' relationships and standing in the community; (4) statements about the case made by the Weltons to others in person and on social media; and (5) concerns expressed by court staff and law enforcement about Terronez' safety. The District Court denied the motion, but stated the matter would be reconsidered if concerns arose during *voir dire*. Foster also filed a motion for production of all of L.W.'s medical records by the State. After an in-camera review, the court denied the motion, reasoning the records were "devoid of any evidence that can fairly be characterized as exculpatory or useful as impeachment evidence."

4

¶7 On September 21, 2015, the trial began and the parties selected a jury over the next two days. That morning, the court held a final pretrial conference in-chambers with Terronez, Foster, Deputy County Attorney Jean Adams, Deputy County Attorney Monte Boettger, and Officer Jenness. Foster reported he had received a "tongue lashing" from Sunnshine and recommended that the Weltons be excluded from trial. The court indicated it had "personally observed some facial expressions and hand gestures and things during the course of testimony" from the Weltons that caused "considerable concern about potential mistrial." The court ordered the Weltons be excluded from trial until they testify, upon which it would re-evaluate the situation. On September 22, the court had a conference in-chambers with the same parties. Adams reported that Sunnshine may have had a purposeful encounter with a prospective juror in the women's restroom. Foster moved to extend the Weltons' exclusion from the courthouse for the entirety of the trial. After interviewing a witness to the incident, the court granted the request, basing its decision mainly on David's earlier confrontation with Judge Oldenburg and Sunnshine's encounter with potential jurors.[1] Foster renewed his motion for a change of venue, but the court denied the motion, stating instead it would admonish the jurors not to talk about the case.

¶8 On September 23, the court held another conference with the same parties in-chambers. Officer Jenness brought to the court's attention a report that David, while viewing the proceeding remotely, had stated that if the jury found Terronez not guilty, he

---

[1] The District Court permitted the State to make arrangements for the Weltons to view the trial proceedings remotely.

would "take care of it himself." The parties discussed increased protection for Terronez. On Friday, September 25, at another in-chambers conference with the same parties, Officer Jenness reported to the court that, sometime during the previous evening, a large chunk of concrete had been thrown through the windshield of Foster's vehicle while it was parked outside the Terronez household. Foster renewed his motion for change of venue and also moved for a mistrial, stating the culmination of issues had "infect[ed] [the] proceeding." The court denied the motion, but again sternly admonished the jurors. Foster expressed his concern, stating he had not "had a lot of time to process" what had occurred and he "just [didn't] know what to do or how to handle" the incident. Foster also expressed his concern for the Terronez children, who were also witnesses, and the rest of Terronez' family. He advised the court he wasn't prepared to proceed. The court expressed sympathy, noting that it had "not had anything quite as extraordinary as this happen," and adjourned the trial until the following Monday.

¶9 Several witnesses testified at trial. L.W. stated that Terronez had used his hand to touch her privates and that his hand was outside her vagina, but in response to a leading question, affirmed his hand had been inside her vagina. Dr. Bolstad testified regarding L.W.'s injuries, stating her diagnosis was partially based on what L.W. reported to have occurred and that she could not state with medical certainty that L.W. sustained her injuries on March 7, or rule out infection or self-touch as explanations. Dr. Bolstad explained that, when L.W. was two or three years old, she had a skin condition called mollescum contagiosum, an infection of small vesicles on her back thighs and buttocks. However, at

6

a January 9, 2015, check-up, two months before the incident, L.W.'s skin was clear. Dr. Bolstad further established that L.W. never had vaginal complaints or urinary tract symptoms. Although Foster had originally planned to call A.T. as a witness and stated his intent to do so in his opening statement, he ultimately decided against doing so and negotiated a stipulation with the State to avoid calling A.T.

¶10 On Monday, September 28, the court held a conference in-chambers with Terronez, Foster, Adams, County Attorney Thomas Meissner (substituting for Boettger), Undersheriff Vaughn, Officer Jenness, and Sheriff Troy Eades. The purpose of the conference was for law enforcement to provide an update on security measures and concerns. Eades commented on the concrete block thrown through Foster's windshield, indicating in his years securing "several trials in this county," he had not seen anything like this and noted that tensions were "relatively high." He suggested Terronez and Foster wear bulletproof vests, and advised the parties they would be required to submit to a metal-detector wand inspection prior to entering the courtroom. Sheriff Eades also updated the court on security measures at the Terronez household. The court cautioned everyone to be "vigilant," and to pay attention to "the people that are coming and going." That evening, although Foster had checked into the Yogo Hotel and rented a new vehicle to avoid detection from the Weltons, the Weltons encountered Foster in the hotel's restaurant.

¶11 On September 29, the court held a conference in-chambers with Terronez, Foster, Meissner, Adams, and Officer Jenness. The court inquired if any plea offers had been relayed to the defense and Adams stated that the State offered a general plea offer, which

7

specified that Terronez would plead guilty to the lesser included offense of felony sexual assault instead of sexual intercourse without consent. Foster stated he had not communicated the offer to Terronez because he wanted the agreement in writing first. The court urged the parties to discuss the matter. During a court recess, Terronez met with Foster and family members to discuss the possible plea agreement. Terronez was worried that he could not win the case, but his family members told him if he had not committed the offense, he should not plead guilty. Terronez ultimately decided to accept the plea agreement.

¶12 During another court recess that afternoon, the parties requested an impromptu meeting with the court, and the court met in-chambers with the same individuals. Foster stated the parties had reached a plea agreement, which stipulated that Terronez would plead guilty to felony sexual assault, and the parties would jointly recommend a sentence of 25 years in prison with a parole restriction for the first 13 years. Adams indicated she wanted to wrap up the agreement quickly because the next day was "18 hours from now" and that she wanted to schedule the change-of-plea hearing for later in the evening because "of the nature of how this case has gone" and because there were "high tensions on all sides." Adams pointed to the benefit of a late-night change-of-plea hearing, indicating that Terronez would have some time to see his children after school was out and their family would be able to have dinner together, and it would give Adams and Meissner time to draft the plea agreement. The court agreed to the evening change-of-plea hearing, and the parties agreed that Terronez would go home then return to the courthouse at 7:15 p.m. to meet

8

with Foster and review the acknowledgement of waiver of rights and plea agreement, with a change-of-plea hearing to follow at 8:00 p.m. The parties and law enforcement then discussed plans to secure the building that evening. The court re-convened the trial to dismiss the jury for the rest of the day, with the intention of bringing the jury back at nine o'clock the next morning to inform them an agreement had been reached.

¶13 Prior to the change of plea hearing, Deputies and Lewistown Police officers cleared the courthouse and were posted in plainclothes and in uniform throughout the building. During the hearing, the court informed Terronez of the rights he was giving up and Terronez confirmed verbally and in writing that he was giving a knowing, voluntary, and intelligent plea. Terronez apologized to L.W. in accordance with the plea agreement and the proceeding concluded. Foster drove back to the Yogo Hotel with a police escort. Tragically, in the early hours of the next morning, Foster committed suicide in his hotel room.

¶14 On October 16, Attorney Michael Sherwood filed a notice of appearance stating he was now representing Terronez. On February 10, 2016, Terronez, through Sherwood, moved to withdraw his guilty plea and rescind the plea agreement. The parties briefed the issue and attached witness affidavits. On May 20, Sherwood requested an evidentiary hearing be set "if the prosecution contests any facts set forth in the various affidavits submitted by Terronez[,]" but deferred to the court as to whether such a hearing was necessary.

¶15 On September 28, without a hearing, the District Court granted Terronez' motion to withdraw his guilty plea, concluding that Terronez had established "good cause" under § 46-16-105(2), MCA, to withdraw his plea. The court based its decision primarily on its conclusion that Foster had rendered ineffective assistance of counsel, reasoning that his trial performance was "deficient or fell below an objective standard of reasonableness" under the first prong of the *Strickland* test, citing the deficiencies as: (1) telling the jury during the opening statement they would hear testimony from A.T., a critical defense witness, but later stipulating to her not testifying; (2) not interviewing several critical prosecution witnesses; (3) failing to subpoena the victim's medical records and instead relying on the prosecution's representation that all the victim's records had been provided to the court; (4) filing a motion to exclude the results of the DNA testing on L.W.'s pajama bottoms in spite of a report indicating the presence of alleles of at least two unknown male subjects, thus casting doubt on Terronez' guilt; and (5) not requesting DNA testing of other males with the means and opportunity to assault L.W. The court concluded that prejudice to Terronez was "properly presumed," or, alternatively, Foster was clearly deficient under the first prong of *Strickland,* and there was a "reasonable probability that, but for counsel's errors, the Defendant would not have pleaded guilty and would have insisted on continuing with trial" under the second prong of *Strickland*.

¶16 Although the District Court primarily based its decision on ineffective assistance of counsel, it also based its decision on a "pervasive air of fear" surrounding the trial that had impacted the proceedings and Foster's performance, highlighting the incident of the

10

concrete block thrown though Foster's windshield, as well as several alleged incidents of the Weltons' threats, stalking, and confrontations. The court observed that these events "objectively appeared to have a serious deleterious effect on [Foster]," who appeared "disheveled" and "overly anxious" (sweating profusely, running his fingers through his hair stammering, pacing, repeating himself, etc.). This behavior was, from the court's perspective, "very uncharacteristic of counsel," and led the court to have "serious doubts about his effectiveness at trial and up to and including the Defendant's guilty plea." Similarly, the court noted Foster was uncharacteristically deficient in cross-examination, and did not mitigate the harmful effects of witness testimony. The court also noted that Foster appeared indecisive on strategy decisions, and described his demeanor after the concrete block incident and before the plea agreement was reached:

> [C]ounsel appeared visibly distraught and fearful for himself as well as the Defendant and the Defendant's family. His behavior became somewhat erratic. For example, the defense had made it known early on that they would be presenting a full defense including evidence of the Defendant's good character and would be calling numerous character witnesses in that regard. The defense also notified the Court and counsel that it would be calling the Defendant's wife and children to testify regarding the alleged assault. Then, suddenly and rather unexpectedly and in the midst of trial, former counsel flatly told the Court and counsel that the defense was abandoning its good character defense and would not be calling the Terronez children to testify. A short while later, counsel returned from lunch and promptly announced once again that the defense would be presenting a full defense including evidence of the Defendant's good character. Mere moments later, the parties notified the Court that they had reached a plea agreement.

¶17 Based on ineffective assistance and the threatening atmosphere surrounding the proceedings, the court concluded that "good cause" was established for allowing Terronez to withdraw his plea. The State appeals.

11

**STANDARD OF REVIEW**

¶18　The ultimate question of whether a plea is voluntarily made is a mixed question of law and fact. *State v. Prindle*, 2013 MT 173, ¶ 16, 370 Mont. 478, 304 P.3d 712 (citing *State v. Brinson*, 2009 MT 200, ¶ 3, 351 Mont. 136, 210 P.3d 164). Consequently, we review a district court's ruling on a motion to withdraw a guilty plea de novo. *Prindle*, ¶ 16. We review a district court's underlying factual findings for clear error. *State v. Warclub*, 2005 MT 149, ¶¶ 22-24, 327 Mont. 352, 114 P.3d 254. We review for correctness the district court's interpretation of the law and its application of the law to the facts. *Warclub*, ¶ 23.

¶19　We review a district court's denial of an evidentiary hearing for a clear abuse of discretion. *State v. Schulke*, 2005 MT 77, ¶ 10, 326 Mont. 390, 109 P.3d 744. A court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *State v. Passmore*, 2010 MT 34, ¶ 51, 355 Mont. 187, 225 P.3d 1229 (citing *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811).

**DISCUSSION**

¶20　*1. Is the State authorized to appeal the District Court's order granting Terronez' motion to withdraw his guilty plea?*

¶21　As a threshold matter, we address Terronez' contention that the State's appeal is barred. Terronez argues the State does not have statutory authority to appeal the District Court's order allowing him to withdraw his guilty plea because none of the enumerated orders listed in § 46-20-103, MCA, from which the State is authorized to appeal, apply

12

here. The State responds § 46-20-103(2)(c), MCA, permits its appeal because the substantive effect of the District Court's order allowing Terronez to withdraw his plea is the granting of a new trial. Section 46-20-103(2), MCA, provides, in pertinent part:

> The state may appeal from any court order or judgment the substantive effect of which results in:
>
> (c) granting a new trial[.]

¶22 Not all plea withdrawals have the substantive effect of granting a new trial, but the circumstances here bring the matter within the language of the statute. At the time Terronez entered his guilty plea, the trial was in its second week. A jury had been selected, and the State had called most of its witnesses and was nearing the end of its case-in-chief. Terronez had the opportunity to preview virtually the entirety of the State's case. Therefore, the substantive effect of the District Court's order allowing Terronez to withdraw his guilty plea entered at this point was to grant Terronez a new trial. The State is thus authorized to appeal under § 46-20-103(2)(c), MCA.

¶23 *2. Did the District Court err by determining that good cause existed to permit Terronez to withdraw his guilty plea?*

¶24 The State argues that a hearing should have been conducted and the District Court's "good cause" determination was in error because it was premised upon hearsay and the failure to "test the [witness] affidavits through the adversarial process." Terronez answers that the District Court relied on undisputed facts, and only needed to determine the underlying law. Terronez also argues the State should have requested an evidentiary hearing if it thought one was needed.

13

¶25 While an evidentiary hearing would ordinarily be necessary and may well have been the prudent course in this case, given that the State was arguably contesting some of Terronez' factual contentions, we conclude the District Court did not clearly abuse its discretion in failing to conduct a hearing under these circumstances. *Schulke*, ¶ 10. We first note that the State did not request a hearing, even after Sherwood asked that a hearing be held "if the prosecution contests any facts set forth in the various affidavits submitted by Terronez." More importantly, the District Court did not rely solely on the witness affidavits, but also relied on its own observations and its assessment of a "pervasive air of fear" surrounding the proceedings and impacting Foster. Further complicating the matter was the impossibility of obtaining from Foster his account of what occurred and the reasoning for his actions during trial, given his untimely death. Both parties had the opportunity to present witness affidavits and did so, providing sworn assertions about the proceedings. A hearing on a request to withdraw a plea is not expressly mandated as a matter of law. Section 46-16-105(2), MCA. We thus conclude the District Court did not act arbitrarily or erroneously by not holding a hearing on the motion.

¶26 The State next disputes the District Court's determination that good cause existed for Terronez' plea withdrawal because of Foster's ineffective assistance of counsel, offering refutations for the District Court's five apparent examples of ineffectiveness. Terronez responds that his plea was involuntarily entered and the court correctly concluded that both prongs of *Strickland* were satisfied, based on evidence of Foster's deficiencies and the resulting prejudice to Terronez.

¶27    A defendant may withdraw his guilty plea within one year of final judgment for "good cause." Section 46-16-105(2), MCA; *State v. Wise*, 2009 MT 32, ¶ 9, 349 Mont. 187, 203 P.3d 741. Good cause "includes the involuntariness of the plea, but it may include other criteria." *Warclub*, ¶ 16 (citation omitted). A plea must be voluntary because the defendant is waiving his constitutional rights to not incriminate himself and to a trial by jury. *Prindle*, ¶ 17 (*citing Brady v. U.S.*, 397 U.S. 742, 748, 90 S. Ct. 1463, 1468-69 (1970)). We have adopted the *Brady* standard to determine if a plea was voluntarily made:

> A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper to the prosecutor's business (e.g. bribes).

*Warclub*, ¶ 18 (*citing Brady*, 397 U.S. at 755, 90 S. Ct. at 1472). The burden is on the defendant to show the plea was involuntary. *See State v. Robinson*, 2009 MT 170, ¶¶ 17-18, 350 Mont. 493, 208 P.3d 851. "If any doubt exists on the basis of the evidence presented regarding whether a guilty plea was voluntarily and intelligently made, the doubt must be resolved in favor of the defendant." *State v. Hendrickson*, 2014 MT 132, ¶ 14, 375 Mont. 136, 325 P.3d 694 (citation omitted).

¶28    Ineffective assistance of counsel can constitute good cause to withdraw a guilty plea. *State v. Valdez-Mendoza*, 2011 MT 214, ¶ 14, 361 Mont. 503, 260 P.3d 151. "Where a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Prindle*, ¶ 17

15

(citing *State v. McFarlane*, 2008 MT 18, ¶ 11, 341 Mont. 166, 176 P.3d 1057). We apply the *Strickland* test for ineffective assistance of counsel to evaluate whether counsel's ineffectiveness impacted the voluntariness of the defendant's plea. *See Hendrickson*, ¶ 16; *McFarlane*, ¶ 11; *Strickland v. Washington*, 446 U.S. 668, 698, 104 S. Ct. 2052, 2070 (1984). Under *Strickland*, "the defendant must show (1) that his counsel's advice fell outside the range of competence demanded of a criminal attorney and (2) but for counsel's deficient performance, he would not have entered a guilty plea." *McFarlane*, ¶ 11. We consider "whether counsel's conduct fell below an objective standard of reasonableness considering prevailing professional norms, and in the context of all circumstances." *McGarvey v. State*, 2014 MT 189, ¶ 25, 375 Mont. 495, 329 P.3d 576. We do not rely on "rigid categorization of counsel's performance as strategic/tactical or ignorant/neglectful" because it is "not an adequate measure of that performance." *Whitlow v. State*, 2008 MT 140, ¶ 19, 343 Mont. 90, 183 P.3d 861. The question is not merely whether counsel's conduct flowed from strategic decisions and trial tactics, but rather, whether it was based on "reasonable" or "sound" professional judgment. *Whitlow*, ¶ 19; *See e.g. Massaro v. United States*, 538 U.S. 500, 505, 123 S. Ct. 1690, 1694 (2003); *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Counsel's conduct is strongly presumed to be within professional norms, and a defendant must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Whitlow*, ¶ 16 (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066).

16

¶29    The District Court determined Foster's performance was deficient because he failed to: (1) call A.T. as a witness after declaring he would do so in his opening statement; (2) interview State witnesses; (3) obtain L.W.'s medical records; (4) argue for admittance of potentially exculpatory DNA evidence; and (5) seek DNA samples with other males with whom L.W. may have had contact. The State counters by offering potentially valid reasons for Foster's actions, including that: (1) Terronez and Dana wanted to prevent A.T. from testifying, even during trial; (2) Foster had his defense investigator interview the State's witnesses to be able to call his investigator to impeach the witnesses if necessary; (3) Foster actually did move for the State to produce all of L.W.'s medical records and the court denied production of such records as not relevant after an in-camera review; (4) the inconclusive lab result identifying two unknown males' alleles on an article of L.W.'s clothing was offered by the State as evidence that DNA evidence is reliable; however, Foster objected to it having no probative value—as it would not be surprising if L.W.'s father or brother's touch DNA was on L.W.'s articles of clothing; and (5) even if Foster were to pursue DNA testing of L.W.'s brother and father, any DNA evidence would not be relevant because the charges against Terronez were based on digital penetration.

¶30    Although we recognize the difficult position of the District Court in evaluating ineffective assistance of counsel without having Foster's explanation of his actions, the State has offered persuasive and plausible explanations for Foster's conduct, particularly in view of the fact that "[c]ounsel's conduct is strongly presumed to be within professional norms." *Whitlow*, ¶ 16. We cannot conclude on this record that Foster failed to exercise

17

reasoned professional judgment that prejudiced Terronez. However, we affirm the District Court's finding that good cause existed for withdrawal of Terronez' plea on alternative grounds discussed in the District Court's order, based on the extreme events that occurred during the proceeding.

¶31 The District Court, referencing Sherwood's affidavit, summarized the facts supporting its determination that there existed a "pervasive air of fear" in the proceeding, including, but not limited to: (1) David's confrontation with Judge Oldenburg; (2) David's threat of suicide, and discharge of a weapon; (3) David tailgating Terronez; (4) Dana asking for a protective order against the Weltons; (5) Foster stating he feared for his safety to a mental health counselor; (6) Foster's attempt to avoid the Weltons by checking into a hotel and switching vehicles, only to encounter the Weltons at that hotel; (7) the Weltons' attempt to video record Terronez' arrest; and (8) Officers being posted inside and outside the courtroom and conducting meetings on safety measures. These occurrences were in addition to the events reported during the trial, including the concrete block thrown through Foster's windshield. The District Court observed the stressful impact of these events upon Foster.

¶32 "An involuntary plea can justify withdrawal, but it is not the only basis for establishing good cause." *State v. Ferris*, 2010 MT 252, ¶ 8, 358 Mont. 244, 244 P.3d 732; *Accord State v. Andrews*, 2010 MT 154, ¶ 11, 357 Mont. 52, 236 P.3d 574; *Wise*, ¶ 9; *McFarlane*, ¶ 11; *Warclub*, ¶ 16; *State v. Lone Elk*, 2005 MT 56, ¶ 19, 326 Mont. 214, 108 P.3d 500, *overruled on other grounds by Brinson*, ¶ 9. We analyze "numerous case-

18

specific considerations" to ascertain whether good cause is shown to withdraw a guilty plea. *Robinson*, ¶ 11; *Accord Lone Elk*, ¶ 23; *Wise*, ¶ 16; See *State v. Nance*, 120 Mont. 152, 164, 184 P.2d 554, 560 (1947) (*quoting State v. McAllister*, 96 Mont. 348, 353, 30 P.2d 821, 823 (1934)) (noting that "each case of necessity must depend upon its own facts and circumstances, and no hard and fast rule can be laid down that will fit every case"); *see also* Commission Comments to § 46-16-105, MCA (*quoting Nance*, 120 Mont. at 164, 184 P.2d at 560). This Court considers such factors as: an inadequate colloquy, newly discovered evidence, intervening circumstances, or any other reason for withdrawing a guilty plea that did not exist when the defendant pleaded guilty. *Robinson*, ¶ 11. We also evaluate ". . . the benefits obtained from the plea bargain, the withdrawal's timeliness, and other considerations that may affect the credibility of the claims presented." *McFarlane*, ¶ 17; (*citing State v. Muhammad*, 2005 MT 234, ¶¶ 14, 24, 328 Mont. 397, 121 P.3d 521).

¶33 We conclude that the District Court did not err in allowing Terronez to withdraw his guilty plea. Sufficient evidence exists within the record to support the mixed fact and law determination of "good cause" for withdrawal based on case-specific circumstances present here, including extensive intimidating, threatening, and inappropriate behaviors, acts of violence, the District Court's own observations of the impact of these events upon the participants, and its description of a pervasive air of fear during the trial. *See McFarlane*, ¶ 17; *Robinson*, ¶ 11 (we consider "numerous case-specific considerations" in determining whether good cause exists for withdrawal.).

19

¶34 The District Court made the factual determination that Foster was personally impacted and his performance was affected by the threatening behaviors from the outset of this case. These findings were not clearly erroneous. Through Foster, Terronez was impacted and his plea was at least partially induced by these events. "If any doubt exists on the basis of the evidence presented regarding whether a guilty plea was voluntarily and intelligently made, the doubt must be resolved in favor of the defendant." *Hendrickson*, ¶ 14. The record here establishes doubt concerning the voluntariness of Terronez' plea.

¶35 Affirmed.


/S/ JIM RICE


We concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR

20